**In re JOHNS–MANVILLE CORPORATION, et al., Debtors.**

**Bankruptcy Nos. 82 B 11656 through 82 B 11676.**

United States Bankruptcy Court, S.D. New York.

Jan. 23, 1984.

Moses & Singer by Robert J. Rosenberg, Bertram Harnett, Richard W. Brewster, Peter J. Gurfein, New York City, for the Committee of Asbestos Related Litigants and/or Creditors.

Silverman & Harnes by Sidney B. Silverman, Martin H. Olesh, New York City, for M.J. Whitman & Co., Inc.

Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A. by Anthony J. Marchetta, Dean A. Gaver, Gary F. Werner, Newark, N.J., for GAF Corp.

Davis, Polk & Wardwell by Stephen H. Case, Lowell Gordon Harriss, Miriam G. Cedarbaum, and Levin & Weintraub & Crames by Michael J. Crames, Herbert S. Edelman, Mitchel Perkeil, New York City, for Johns-Manville Corporation, et al., debtor.

Milbank, Tweed, Hadley & McCloy by John J. Jerome, New York City, for the Committee of Unsecured Creditors.

Weil, Gotshal & Manges by Ira M. Millstein, Harvey R. Miller, Ellen R. Werther, New York City, for Owens-Illinois, Inc.

Covington & Burling by William H. Allen, Philip R. Stansbury, Oscar M. Garibaldi, Washington, D.C., and Alexander, Ash, Schwartz & Cohen, P.C. by Marshall M. Kolba, New York City, for Armstrong World Industries, Inc., et al.

Hahn & Hessen by George A. Hahn, Angela G. Tese, New York City, for the Committee of Equity Security Holders.

Wolf, Popper, Wolf & Jones, New York City, David Berger, P.A., Philadelphia, Pa., Daniel A. Speights, Hampton, S.C., for the Creditors Committee of Asbestos-Related Property Damage School Claimants.

## DECISION AND ORDER ON MOTIONS TO DISMISS MANVILLE'S CHAPTER 11 PETITION

BURTON R. LIFLAND, Bankruptcy Judge.

### I. *Background and Issues Presented*

Whether an industrial enterprise in the United States is highly successful is often gauged by its "membership" in what has come to be known as the "Fortune 500". Having attained this measure of financial achievement, Johns-Manville Corp. and its affiliated companies (collectively referred to as "Manville") were deemed a paradigm of success in corporate America by the financial community. Thus, Manville's filing for protection under Chapter 11 of Title 11 of the United States Code ("the Code or the Bankruptcy Code") on August 26, 1982 ("the filing date") was greeted with great surprise and consternation on the part of some of its creditors and other corporations that were being sued along with Manville for injuries caused by asbestos exposure. As discussed at length herein, Manville submits that the sole factor necessitating its filing is the mammoth problem of uncontrolled proliferation of asbestos health suits brought against it because of its substantial use for many years of products containing asbestos which injured those who came into contact with the dust of this lethal substance. According to Manville, this current problem of approximately 16,000 lawsuits pending as of the filing date is compounded by the crushing economic burden to be suffered by Manville over the next 20–30 years by the filing of an even more staggering number of suits by those who had been exposed but who will not manifest the asbestos-related diseases until some time during this future period ("the future asbestos claimants"). Indeed, approximately 6,000 asbestos health claims are estimated to have arisen in only the first 16 months since the filing date. This burden is further compounded by the insurance industry's general disavowal of liability to Manville on policies written for this very purpose. Indeed, the issue of coverage has been pending for years before a state court in California ("the California Coordinated Litigation"). *See* discussion of trigger to insurance coverage in Correlated Decision No. 2 ("Decision No. 2") issued synchronously.

It is the propriety of the filing by Manville which is the subject of the instant decision. Four separate motions to dismiss the petition pursuant to Section 1112(b) of the Code have been lodged before this Court by: (1) The Committee of Asbestos-Related Litigants and/or Creditors ("the Asbestos Committee"); (2) M.J. Whitman & Co. ("Whitman"); (3) GAF Corporation; and (4) Armstrong World Industries, Inc., Acands, Inc., Brinco Mining, Ltd., Cummings Insulation Co., Inc., Delaware Insulation Co., Eagle-Picher Industries, Inc., Fibreboard Corp., Keene Corp., The McCormick Asbestos Co., Metalclad Insulation Corp., North Bros. Co., Owens-Illinois, Inc., Pacor, Inc., Pittsburgh Corning Corp., Rock Wool Manufacturing Co., Shook & Fletcher Insulation Co., and W.R. Grace & Co. ("the Co-defendants"). In addition, Keene Corporation has filed a motion for the Appointment of a Legal Representative for Manville's Future Asbestos Claimants which is

the subject of Decision No. 2.[1]  Oral argument on all of these motions was heard on January 5, 1984.

Manville has opposed all four dismissal motions and has been joined in opposition to them by the Unofficial Committee of School Creditors and the Equity Holders Committee.  The Unsecured Creditors Committee has filed a brief "in response" to the motions which advocates denial of the motions.

The Asbestos Committee, which is comprised with one exception of attorneys for asbestos victims, initially moved to dismiss this case on November 8, 1982 citing Manville's alleged lack of good faith in filing this petition.  However, the Asbestos Committee did not press its motion before the Court until now, more than one year later.  In the interim, while engaging in plan formulation negotiations, it has ·vigorously pursued discovery in order to bolster its factual contention that Manville knowingly perpetrated a fraud on this Court and on all its creditors and equity holders in exaggerating the profundity of its economic distress in 1981 so as to enable it to file for reorganization in 1982.  Thus, the Asbestos Committee submitted in November 1983 a multitude of volumes of materials consisting of 55 days of depositions of Manville officers in alleged support of the inference that in 1981 a small Manville group "concocted" evidence to meet the requirements for filing a Chapter 11 petition.  The Asbestos Committee alleges that this group manufactured evidence of crushing economic distress so as to demonstrate falsely that pursuant to required principles of accounting (Financial Accounting Standards Board No. 5 ("FASB–5")), Manville had to book a reserve of at least $1.9 billion for asbestos

health liability, and thus had no alternative but to seek Chapter 11 protection.  The booking of such a reserve would, in turn, have triggered the acceleration of approximately $450 million of outstanding debt, possibly resulting in a forced liquidation of key business segments.  Thus, the multitudinous submissions by the Asbestos Committee are aimed at showing their challenge to the motive, methods and data used by Manville's accounting consultants, its management and its Litigation Advisory Group ("LAG") in determining whether relief under Chapter 11 should be sought.

Mindful that there is no insolvency requirement for Chapter 11 debtor status, the issue presented for determination by this Court is whether these allegations of error by the Asbestos Committee, even egregious error, in over-calculation of Manville's financial problems are relevant to establish the kind of bad faith in the sense of an abuse of this Court's jurisdiction which will vitiate the filing of a Chapter 11 petition. This opinion will thus elucidate whether the tomes of material submitted by the Asbestos Committee defeat the essential fact that as of August 26, 1982 Manville is a real company with real debt, real creditors and a compelling need to reorganize in order to meet these obligations.

The Whitman motion dated November 1, 1982, the GAF motion dated September 29, 1983 and the most recently filed Co-defendants' motion dated December 14, 1983 all advance purely legal arguments and require no factual determination by this Court. They are based on the theory that because the claims of future asbestos victims are not cognizable or dischargeable in bankruptcy, the *raison d'etre* for the filing is

---

1.  Numerous other motions have been filed with this Court dealing with, *inter alia,* the propriety of Manville's proposed plan of reorganization and other concerns within the framework of this reorganization case.  These motions include: (1) Manville's motion to set a bar date for filing of proofs of claim; (2) Manville's motion to determine the fees of attorneys for asbestos victims; (3) Manville's motion to establish a claims-estimation facility for present and future claims pursuant to Code Section 502(c); (4) The Asbestos Committee's Motion

to Deny Manville the Right to Solicit Acceptances for its Proposed Plan; (5) The Asbestos Committee's Motion to Lift the Stay to Allow Asbestos Suits to Proceed to Judgment; (6) The Asbestos Committee's Motion to Appoint a Trustee to Operate the Debtor.

Because none of these motions can go forward before the issuance of a decision regarding the threshold challenge to the Chapter 11 cases, the resolution of these motions has been suspended and they are currently scheduled for post decisional consideration.

vitiated and thus the petition should be dismissed. However, this Court must bear in mind in determining the issues raised by these movants that even if the claims of future claimants are ultimately found not dischargeable, that finding does not necessarily preclude this Court from dealing with the interests of these "parties in interest" under Code Section 1109(b), especially since blinding the reorganization process to their residual interests would doom this reorganization case to ineffectiveness. If future claimants are properly represented as parties in interest, the means for the emergence of a proper plan which fairly provides for the survival and just treatment of their interests post-petition will be better assured. See Decision No. 2 on Correlated Manville Matters.

As background information, it should be noted that throughout the course of the past 16 months, all parties, including the movants herein, have participated to a substantial extent in negotiations aimed at formulating a consensual plan treating all interests justly and fairly. Indeed, it is interesting to note that some of the very co-defendants which now seek to dismiss the petition, notably Owens-Illinois and Keene Corp., have previously expressed on the record before this Court their fervent desire to engraft themselves onto any plan providing for a claims-handling facility with which to deal with asbestos claimants. They have related to the Court their arduous efforts at formulating a sharing arrangement whereby all co-defendants, including Manville, may apportion their relative liabilities to the victims as a first step toward full participation in and contribution to any claims-handling Manville reorganization plan to be funded by an industry "super fund".

In addition, Keene Corp., also one of the co-defendants seeking to dismiss the petition, is the proponent of the related motion, see Decision No. 2, to appoint a legal representative for future asbestos claimants proposed for the purported purpose of enabling this reorganization to deal effectively with this key constituency and thereby succeed. The shifting posture of many of the co-de-fendants is in no small measure impelled by their continued involvement in the nonbankruptcy asbestos litigation and the filing by Manville of a plan that as yet does not provide a sharing and contribution arrangement. In any event, whether or not the co-defendants may for the purpose of the dismissal motions deem it prudent to participate in the reorganization effort and effect a global solution to the asbestos problem, Manville should have the opportunity to attempt to successfully reorganize with or without them so long as it conforms to all Code requirements.

Throughout this 16-month period, the Asbestos Committee, at considerable expense to the debtor, has engaged its own counsel and epidemiologists and, jointly with the Unsecured Creditors Committee, engaged an investment banking firm to prepare projections of future income in aid of plan formulation. It is only now that negotiations have become seemingly deadlocked that the Asbestos Committee has reverted to its original position of attacking the filing. If there was merit in the motion to dismiss on grounds of lack of good faith, it could have been fervently pressed a year ago instead of tolerating this alleged misuse of the courts. This same assertion of untimeliness can be made regarding the other co-defendant proponents of dismissal of the petition because they too may be pressing these motions as a last resort as a result of frustrations at the bargaining table. This Court must therefore bear in mind the strategical motivations underlying the pursuit of these motions at this time as well as recognize the progress toward a successful, perhaps consensual, reorganization that has already taken place. It is against this backdrop of progress and achievement accomplished by the key constituencies toward a resolution on perhaps a sweeping basis of the asbestos problem that the instant motions are now placed before me for determination.

## II. Discussion of Law

### A. General Eligibility Requirements for Chapter 11 Status

The motions to dismiss Manville's petition filed by the Asbestos Committee, GAF,

Whitman, and the Codefendants must be denied. Preliminarily, it must be stated that there is no question that Manville is eligible to be a debtor under the Code's statutory requirements. Section 109 of the Code contains its eligibility requirements and provides in pertinent part:

(a) Notwithstanding any other provision of this section, only a person that resides in the United States, or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title

(b) A person may be a debtor under Chapter 7 of this title only if such person is not—

(1) a railroad;

(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, or credit union; or

(3) a foreign insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, or credit union, engaged in such business in the United States

.    .    .    .    .

(d) Only a person that may be a debtor under Chapter 7 of this title, except a stockbroker or commodity broker, and a railroad may be a debtor under Chapter 11 of this title.

Clearly, Manville meets the requirements contained in subsection (a) for debtors under all chapters of the Code in that it is domiciled and has its place of business in the United States. Also, the word "person" used in subsection (a), as defined in Code section 101(30), includes an individual, a partnership, and a corporation, but not a governmental unit. *See* 2 Collier on Bankruptcy ¶ 109.01 at 109–4 (1982).

In addition, Manville meets the eligibility requirements contained in subsection (b) and made applicable to Chapter 11 debtors by subsection (d). *See id.,* ¶ 109.04 at 109.-19. Manville is obviously not any of the prohibited entities described in subsection (b).

▮ Moreover, it should also be noted that neither Section 109 nor any other provision relating to voluntary petitions by companies contains any insolvency requirement. *See In re Century City, Inc.,* 8 B.R. 25, 31 (Bkrtcy.D.N.J.1980); *cf. The Chrysler Corporation Financial Situation: Hearings on H.R. 5805 Before The Subcommittee on Economic Stabilization of the House Committee on Banking, Finance and Urban Affairs,* 96th Cong., 1st Sess. 6 (1979), where Professor Frank Kennedy states: "[I]t is no longer necessary for a petitioner for reorganization to allege or show insolvency or inability to pay debts as they mature." The Collier treatise so declares with regard to Chapter 7 debtors, stating: "Under this subdivision any person not within the excluded class who owes debts in any amount, no matter how small, may file a petition for liquidation." *See id.,* ¶ 109.02 at 109–11. And, with specific regard to Chapter 11, the Code eliminates the requirement contained in former Sections 77(a), 130(1), 323 and 423 of the Act that the debtor be insolvent or unable to pay his debts as they mature. *See* Miller and Cook, *A Practical Guide to the Bankruptcy Reform Act* at 51 (1979). This is in striking contrast to the requirement of insolvency contained in Code Section 303 with regard to the commencement of involuntary cases. Code Section 303(h) provides in pertinent part:

If the Petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case . . . only if—

(1) *the debtor is generally not paying such debtor's debts as they become due.* . . .

In contrast, Code Section 301 provides:

A voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter. The commencement of a voluntary case under a chapter of

this title constitutes an order for relief under such chapter.

It is only with regard to Chapter 9 (Adjustment of Debts of a Municipality) that the Code mentions insolvency or inability to meet one's debts. *See* Code Section 109(c)(3).

Accordingly, it is abundantly clear that Manville has met all of the threshold eligibility requirements for filing a voluntary petition under the Code. This Court will now turn to the issue of whether any of the movants have demonstrated sufficient "cause" pursuant to Code Section 1112(b) to warrant the dismissal of Manville's petition.

B. *The Standard of "Cause" for Dismissal of a Chapter 11 Petition*

■ Section 1112(b) of the Code provides for conversion or dismissal of a case for "cause". It lists nine examples of cause, but the list is not exhaustive. One court has described the pertinent legislative history, declaring: "The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases. What constitutes cause under section 1112(b) is subject to judicial discretion under the circumstances of each case." *In re Nancant, Inc.,* 8 B.R. 1005, 1006 (Bkrtcy.Mass.1981) (discussing House Report No. 95–595, 95th Cong., 1st Sess. (1977) 405, 406, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963 at 6361–62 and Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 117, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5903). *See also In re Century City, Inc.,* 8 B.R. 25, 30; *In re Northwest Recreational Activities, Inc.,* 4 B.R. 36, 39 (Bkrtcy.N.D.Ga.1980), *plan confirmation,* 4 B.R. 43 (Bkrtcy.N.D.Ga.1980).

Code Section 1112(b) provides:

(b) Except as provided in subsection (c) of this section, on request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan; and

(9) termination of a plan by reason of the occurrence of a condition specified in the plan.

As is set forth in detail in part D *infra,* the interests of future claimants need not be discharged to be accounted for and fully and fairly represented in these proceedings. Indeed, under Manville's currently proposed plan, future claims would survive the Chapter 11 and would presumably be eligible to be liquidated by a claims handling facility or by another method as yet undetermined. Thus, the motions to dismiss filed by GAF, Whitman and the Codefendants premised on speculation as to the nondischargeability of future claims do not establish sufficient "cause" pursuant to Section 1112(b) and must be denied in their entirety. *See* discussion on treatment of future claimants *infra* and Decision No. 2 on the appointment of a representative accompanying this decision.

Furthermore, much of the argument in support of all of the motions to dismiss is pitched to the confirmability of Manville's proposed plan. This argument is misplaced. Under the statutory reorganization scheme, there can be many plans advanced by many

interests. Also, the concept of perpetual debtor in possession is not unlimited, nor is the possibility of liquidation or other forms of asset management beyond speculation. The essential determination here is the propriety of the filing, and whether "cause" exists to vitiate it, not the confirmability of a particular plan. If Manville is unable to effectuate a particular plan, that is not tantamount to finding that no plan can be effectuated.

### C. The Motion to Dismiss Filed by The Asbestos Committee

■ The motion to dismiss the petition filed by the Asbestos Committee must also be denied. The Asbestos Committee premises its motion to dismiss the petition on what it contends is Manville's "bad faith" in filing for protection under Chapter 11. As the Asbestos Committee states in its brief submitted to the district court in support of its unsuccessful motion to withdraw the reference on the instant motion: "The Asbestos Committee is prepared to prove that Manville's Chapter 11 petition is purely a bad faith maneuver by Manville to curtail its liabilities...." And, in its papers in support of that motion to dismiss, the Asbestos Committee states: "These Chapter 11 cases were filed in bad faith, are an abuse of the provisions of Chapter 11 and an imposition on this Court's jurisdiction and should therefore be dismissed without further delay".

Because the allegations of the Asbestos Committee are not supported by concrete facts and thus do not rebut the essential fact that Manville is a real company with a substantial amount of real debt and real creditors clamoring to enforce this real debt, the Asbestos Committee has not sustained its burden of demonstrating sufficient fraud to vitiate the filing *ab initio*. On balance, the inferences to be drawn from submissions by both Manville and the Asbestos Committee seem to favor Manville. This is because Manville has credibly analyzed its position in its counter to the Asbestos Committee's allegations of fraud contained in its submission of a Substantive

Check of Asbestos Committee Evidentiary Representations ("the Substantive Check") and a Compendium of the Factual Record On the Issue of the Propriety of the Chapter 11 Filing ("the Compendium"). The Substantive Check displays that a great number of the allegations contained in the Asbestos Committee's Affidavit of Stanley Levy in Support of its Motion ("the Levy Affidavit") are backed by the submission of either no evidence or wholly inconclusive evidence in support thereof.

Manville's Compendium refers to specific deposition testimony of Manville officers taken by the Asbestos Committee throughout the course of the 55 days of its Rule 205 exam of Manville, parts of which were used in the papers in support of the Asbestos Committee's dismissal motion. The testimony cited to by Manville creates a strong inference that the Asbestos Committee has not sustained its burden of proving fraud in that its allegations of fraud are unsupported. The Compendium relates the testimony of Manville officers and supports the inference accepted herein that these petitions were filed only after Manville undertook lengthy, careful and detailed analysis. For example, Manville commissioned and strictly scrutinized the results of studies by two separate epidemiological groups, Epidemiological Research Institute ("ERI") and Statistics and Epidemiological Research Corporation ("SERC"). According to Manville, the results of the studies by ERI and SERC corroborated each other's projections of runaway asbestos health costs within the foreseeable future.

In addition, the Compendium cites to testimony of Manville officers which details the slow and deliberate process of data commissioning and review and "soul-searching" antedating the filing, including the employment and review of results of studies done by Lexacon, Inc. and Drs. Sarat and Kritzler regarding propensity to sue. The data submitted by Manville also supports the accepted inference that the $1.9 billion projected debt figure ratified by Manville

was the result of careful, conservative and perhaps understated projections.[2]

In so doing, Manville has succeeded in rebutting in general and in specific the Asbestos Committee's allegations of fraud regarding the size of its projected debt, including those of collusion, manipulation of figures, cover-up and falsification of data. That which therefore emerges from the voluminous submissions by both sides are unsubstantiated conclusory charges of fraud and misdeed and an expression by the Asbestos Committee of its disagreement with the methods used by Manville in projecting future asbestos health costs.

Manville was advised by Robert O.F. Bixby of the Price Waterhouse accounting firm that it was necessary to book a $1.9 billion reserve for contingent liability according to the accrual principle in FASB-5. On balance, Manville's decision to follow this advice was neither unreasonable, illogical, nor in any sense fraudulent. The Asbestos Committee has submitted no convincing evidence countering the necessity to book this reserve. In contrast, Manville has supplied evidence in its Compendium that rebuts the inference that Mr. Bixby was not an independent advisor, including the fact that the debtor supplied him with information in the usual manner for such a study and reviewed his work by its special committees. The debtor also has submitted, and this Court agrees, that whether a company should accrue for a contingent liability cannot be answered simply. It is a question to be considered within the professional judg-

ment of the accountant. Thus, the burden of rebutting that judgment is great.

Therefore, on balance, the Asbestos Committee has failed to sustain its burden of proof of fraud as to either the magnitude of the reserve to be booked or the necessity of so booking this reserve. As the Bankruptcy Court in *In re Donaldson Ford, Inc.,* 19 B.R. 425, 6 C.B.C.2d 564, 573 (Bkrtcy.N.D.Ohio 1982), held, where an insufficient showing of fraud is made on a dismissal motion predicated on such showing, dismissal should not be granted.

1. *The Code's Policies of Open Access and Liquidation Avoidance*

In determining whether to dismiss under Code Section 1112(b), a court is not necessarily required to consider whether the debtor has filed in "good faith" because that is not a specified predicate under the Code for filing. Rather, according to Code Section 1129(a)(3), good faith emerges as a requirement for the confirmation of a plan. The filing of a Chapter 11 case creates an estate for the benefit of all creditors and equity holders of the debtor wherein all constituencies may voice their interests and bargain for their best possible treatment. *See In re UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984) where just a few days ago the Seventh Circuit in dicta declared in the context of an asbestos-predicated bankruptcy, that the UNR which emerges from bankruptcy is synonomously "the creditors who will own UNR at the conclusion of the reorganization". at 1120. It is thus logical that the good faith of the debtor be deemed

---

2. The Compendium creates a strong inference of a conservatism built into Manville's process of projecting total debt. The affidavit and examination testimony of Manville officer Richard Von Wald evidences that contrary to indications of an increase in the litigiousness of asbestos claimants, Manville held the propensity to sue variable constant. Also, Von Wald indicated that the projections took into account only the moderate to severe asbestos disease cases, assumed full insurance recovery, did not escalate costs, and did not include punitive damages in the cost calculations. *See* Compendium at 62. Moreover, it should also be noted that although the Levy Affidavit in support of the Asbestos Committee's Motion to

Dismiss charges that Manville has currently overstated its asbestos liabilities, Mr. Levy's firm as counsel to the class in the *Abrams* litigation filed in 1979 had previously charged that Manville had knowingly *underestimated* these liabilities. *See* Compendium at 37. Given the above considerations, it is indeed quite possible that Manville has overestimated its cash flow and/or underestimated its total tort liabilities in its figures in support of this petition. The spectre of a company more distressed than it reveals is a distinct possibility, especially given all of the allegations of Manville mismanagement contained in the Asbestos Committee's motion scheduled to be heard by this Court hereinafter. *See* footnote 1 *supra.*

a predicate primarily for emergence out of a Chapter 11 case. It is after confirmation of a concrete and immutable reorganization plan that creditors are foreclosed from advancing their distinct and parochial interests in the debtor's estate.

A "principal goal" of the Bankruptcy Code is to provide "open access" to the "bankruptcy process". Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, Part II, 93rd Cong., 1st Sess. 75, 79 (1973); H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977). The rationale behind this "open access" policy is to provide access to bankruptcy relief which is as "open" as "access to the credit economy." *Id.* at 75. Thus, Congress intended that "there should be no legal barrier to voluntary petitions." *Id.* Another major goal of the Code, that of "rehabilitation of debtors", requires that relief for debtors must be "timely". *Id.* at 79. Congress declared that it is essential to both the "open access" and "rehabilitation" goals that

> [i]nitiating relief should not be a death knell. The process should encourage resort to it, by debtors and creditors, that cuts short the dissipation of assets and the accumulation of debts. Belated commencement of a case may kill an opportunity for reorganization or arrangement.

*Id.* at 75.

Accordingly, the drafters of the Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition. The "Congressional purpose" in enacting the Code was to encourage resort to the bankruptcy process. *Id.* This philosophy not only comports with the elimination of an insolvency requirement, but also is a corollary of the key aim of Chapter 11 of the Code, that of avoidance of liquidation. The drafters of the Code announced this goal, declaring that reorganization is more efficient than liquidation because "assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap." H.R.Rep. No. 95–989, U.S.Cong. & Ad.News at 6179, *cited in In re Ponn Realty Trust,* 4 B.R. 226, 230 (Bkrtcy.D.Mass.1980). Moreover, reorganization also fosters the goals of preservation of jobs in the threatened entity. *See In re Coram Graphic Arts,* 11 B.R. 641, 645 (Bkrtcy.E.D.N.Y.1981).

In the instant case, not only would liquidation be wasteful and inefficient in destroying the utility of valuable assets of the companies as well as jobs, but, more importantly, liquidation would preclude just compensation of some present asbestos victims and all future asbestos claimants. This unassailable reality represents all the more reason for this Court to adhere to this basic potential liquidation avoidance aim of Chapter 11 and deny the motions to dismiss. Manville must not be required to wait until its economic picture has deteriorated beyond salvation to file for reorganization.

In keeping with the goal of liquidation avoidance, the Second Circuit in *Banque de Financement v. First National Bank of Boston,* 568 F.2d 911 (2d Cir.1977), demonstrated that courts should not dismiss a Chapter 11 case where the debtor has any significant prospect of successfully reorganizing the structure of its real debt. The Second Circuit thus reversed the affirmance by District Judge Ward of the bankruptcy court's dismissal of a Chapter XI petition. The bankruptcy judge had dismissed this petition because of a belief that a confirmable plan of reorganization could not eventuate. In reversing the dismissal order, the Second Circuit cautioned that "a bankruptcy court's exercise of his inherent power to dismiss must be limited by the express terms of the Bankruptcy Act." *Id.* at 915. The Second Circuit thus declared:

> "In finding that Finabank never intended to pursue the Chapter XI proceeding to obtain confirmation of a plan of arrangement, the bankruptcy court looked to events—*e.g.,* Finabank's multiple defaults in filing a plan and its counsel's concessions regarding the likelihood of rehabilitation—which occurred *after* the petition was filed... Although such *post*-filing

event may be probative of an absence of intent to seek an arrangement *at the time of filing,* they fall short of supporting the bankruptcy court's exercise of inherent power in the case."

*Id.* at 916 (citations omitted) (emphasis in original)

Thus, the Second Circuit concluded that merely because the need to frustrate attachments by creditors of Finabank motivated Finabank's filing, this motivation did not in and of itself vitiate the filing because it did not establish an abuse of jurisdiction by showing an absence of genuine intent to seek rehabilitation. Similarly, Manville's purported motivation in filing to obtain a breathing spell from asbestos litigation should not conclusively establish its lack of intent to rehabilitate and justify the dismissal of its petition. On the contrary, there has been submitted no evidence that Manville has not bargained to obtain a reorganization plan in good faith.

### 2. *Manville's "Good Faith" Filing Is Measured By The Existence Of Massive Unmanageable Real Debt Owed To Real Claimants*

■ It is this Court's belief that there is no strict and absolute "good faith" predicate to filing a Chapter 11 petition. Earlier bankruptcy laws, for example, former Chapter X relating to corporate debtors specifically required that the court find that the petition "had been filed in good faith". *See* §§ 141, 146, 11 U.S.C. §§ 541, 546 (1976) (repealed). However, the present Bankruptcy Code contains no such express requirement.

This Court, along with others, has opined that the concept of good faith is an elastic one which can be read into the statute on a limited *ad hoc* basis. *In re Eden Associates,* 13 B.R. 578, 584 (Bkrtcy.S.D.N.Y.1981) However, in *Eden* this Court also cautioned that slavish adherence to a good faith concept may redound to the detriment of those non-debtor claimants who are or may putatively be beneficiaries of the reorganization process. This Court thus expressed the policy rationale contained within the Second

Circuit's pronouncement in *Financement,* that a Chapter 11 filing creates a bankruptcy estate which exists for the benefit not simply of the debtor, but rather also for the benefit of all of the debtor's creditors and equity holders. The filing triggers the springing into existence of important constituencies which, along with the debtor, must be protected by a reorganization court. Accordingly, the intense focus on the debtor's motives in filing is misplaced. In *Eden,* this Court stated:

> Good faith as the *sine qua non* for the filing and maintenance of a Chapter 11 case should be probed elastically and on a case-by-case basis. To do otherwise invites unnecessary rigidity in bankruptcy administration emasculating bright prospects of reorganization by slavish review of pre-petition dealings by debtors with their creditors.

*Eden,* 13 B.R. 578, 584.

■ And in *Financement,* the Second Circuit declared: "[I]n view of the objective of the Bankruptcy Act of insuring equal distribution of assets among general creditors, such filings should not be discouraged. *Financement, supra* 568 F.2d at 917. Accordingly, it follows logically that in the case of a filing by a viable and legitimate company with real creditors not formed as a sham solely for the purpose of filing, the burden of establishing the company's "good faith" should be tested where Congress placed it: for emergence out of Chapter 11 pursuant to Section 1129.

Moreover, courts have generally held that the concept of good faith as of the filing date may only be applied where it is demonstrated that the jurisdiction of the bankruptcy court has been abused. One frequently cited decision declares:

> "[D]ismissal for lack of 'good faith' as distinguished in the jurisdictional integrity sense ... is not precluded by the new Code. *Good faith, in the sense perceived by this court to have continued relevance, is merged into the power of the court to protect its jurisdictional integrity* from schemes of improper petitioners seeking to circumvent jurisdictional restrictions

and from petitioners with demonstrable frivolous purposes absent any economic reality."

*In re Northwest Recreational Activities, Inc.,* 4 B.R. 36, 39 (Bkrtcy.N.D.Ga.1980) (emphasis added)

For example, this kind of abuse of jurisdiction is demonstrated where a reorganization debtor never operated legitimately or was formed for the sole purpose of filing. *In re Eden Associates, supra* (abuse declared where debtor filed to shield assets of more affluent companies from bankruptcy court). *Accord, In re Thirtieth Place, Inc.,* 30 B.R. 503, 10 B.C.D. 1409 (Bkrtcy.App. Ariz. 9th Cir.1983) (abuse declared where debtor created to file petition so as to prevent foreclosure on property and delay creditors); *In re Alison Corp.,* 9 B.R. 827 (Bkrtcy.S.D.Cal.1981) (abuse declared where debtor filed solely to recoup investment or obtain profit in lieu of foreclosure proceeding).

In addition, where there has been a change in legal form prior to the filing from an ineligible entity to one able to file under this Chapter in order to avoid a foreclosure sale, a court should inquire into the debtor's good faith to ensure that the Code's purposes are not being abused and that the debtor is the kind of entity within the contemplation of the Code. *See, e.g., In re G–2 Realty Trust,* 6 B.R. 549 (Bkrtcy.D. Mass.1980). *See also In re Zed, Inc.,* 20 B.R. 462, 9 B.C.D. 223 (Bkrtcy.N.D.Cal.1982). The court in *In re Bonded Mailings, Inc.,* 20 B.R. 781, 785 (Bkrtcy.E.D.N.Y.1982), cogently elucidated this concept, declaring:

> Dismissal has generally only been granted where the filing of the case was a bad faith sham on the court. *In re Victory Construction Co.,* 9 B.R. 549, 563–65 (Bkrtcy.C.D.Cal.1981). In other words in those cases in which the company that filed never operated in business, never made a profit, was formed just to file, is losing money postpetition, has no hope of rehabilitation and has no unsecured creditors, it has been held that such a petition was filed merely to take advantage of the automatic stay, that that is an abuse of

the bankruptcy court's jurisdiction and that the case should be dismissed. *See, e.g., In re First Lewis Road Apartments, Inc.,* 11 B.R. 576 (Bkrtcy.E.D.Va.1981); *In re Nancant, Inc.,* 8 B.R. 1005 (Bkrtcy. D.Mass.1981); *In re Dutch Flat Investment Co.,* 6 B.R. 470 (Bkrtcy.E.D.Ga. 1980). *See generally, In re Northwest Recreational Activities, Inc.,* 4 B.R. 36, 1 C.B.C.2d 713 (Bkrtcy.N.D.Ga.1980). However, where as here a once viable business supporting employees and unsecured creditors has more recently been burdened with judgments that threaten to put it out of existence, unless and until rehabilitation has been shown to be unfeasible, the bankruptcy courts are a most appropriate harbor within which to weather the storm.

Other courts have declared abusive filings where the debtor filed to forestall tax liability without any need for reorganization of debt, *see In re Nancant, supra,* and where the debtor filed solely to frustrate enforcement of power of sale provisions under a deed of trust, *see In re Fast Food Properties, Ltd.,* 5 B.R. 539 (Bkrtcy.C.D.Cal. 1980). Indeed, the courts in *Century City, supra,* and *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764–65 (1st Cir.1983), two cases cited by the Asbestos Committee, declared abusive filings, but for the specific reason that there was no real debt and no real creditors in need of a reorganization plan. Thus, in *Century City,* the court declared: "[S]uffice it to say that, absent real debt and real creditors on the part of the debtor, the basic purpose of a chapter 11 would be thwarted." 8 B.R. at 31–32.

Clearly, none of the justifications for declaring an abuse of the jurisdiction of the bankruptcy court announced by these courts are present in the *Manville* case. In *Manville,* it is undeniable that there has been no sham or hoax perpetrated on the Court in that Manville is a real business with real creditors in pressing need of economic reorganization. Indeed, the Asbestos Committee has belied its own contention that Manville has no debt and no real creditors by quantifying a benchmark settlement

demand approaching one billion dollars for compensation of approximately 15,500 prepetition asbestos claimants, during the course of negotiations pitched toward achieving a consensual plan. This huge asserted liability does not even take into account the estimated 6,000 new asbestos health claims which have arisen in only the first 16 months since the filing date. The number of post-filing claims increases each day as "future claims back into the present." *See* Brief of Equity Holders Committee in Opposition to Motions to Dismiss the Petition.

Moreover, asbestos related property damage claims present another substantial contingent and unliquidated liability. Prior to the filing date, various schools initiated litigation seeking compensatory and punitive damages from, *inter alia,* Manville for their unknowing use of asbestos-containing products in ceilings, walls, structural members, piping, ductwork and boilers in school buildings. Cases initiated prepetition include *School District of Lancaster v. Asarco,* Nos. 1414 and 1415 (Phila.Ct. of Common Pleas, June Term 1982) (class actions on behalf of all public and private schools in Pennsylvania); *Richland School District No. 1 v. Johns-Manville Sales Company,* 82–CP–40–3050 (Richland County Court of Common Pleas) and *Lexington County School Dis-*

trict No. 5 v. United States Gypsum Co., Civ. Action No. 82–2072–0 (D.S.C.). Since the filing date, two class action suits have been brought in the federal district court for the Eastern District of Pennsylvania. *See School District of Lancaster et al. v. Lake Asbestos of Quebec, Ltd., et al.,* Civ.Ac. No. 83–0268 (E.D.Pa.); *Barnwell School District No. 45 v. U.S. Gypsum, et al.,* Civ.Ac. No. 83–1395 (E.D.Pa.). These two class actions on behalf of every public school district and private school in the United States seek comprehensive redress for the school asbestos problem including compensatory damages for remedial action already undertaken by the schools, injunctive relief for necessary action not as yet undertaken, and punitive damages. Numerous postpetition school property damage suits have also been filed by individual school districts and schools in many states.[3]

Accordingly, it is clear that Manville's liability for compensatory, if not punitive, damages to school authorities is not hypothetical, but real and massive debt. A range of $500 million to $1.4 billion is the total projected amount of Manville's real debt to the school creditors.[4]

In addition, claims of $425 million of liquidated commercial debt have been filed in

**3.** *See, e.g., City of Manchester v. National Gypsum Company, et al.,* Civ. Ac. 83–143–L (D.N. H.); *Board of Trustees, Gulfport Municipal School District v. National Gypsum Company, et al.,* Civ. Ac. No. 5–83–0943 (S.D.Miss.); *County of Loudon v. United States Gypsum, et al.,* Civ. Ac. 3–83–329 (E.D.Tenn.); *Montgomery County Board of Education v. W.R. Grace, et al.,* Civ.Ac. 83V–779 (M.D.Ala.); *Greenville County School District v. U.S. Gypsum, et al.,* Civ. Ac. 82–3142–14 (D.S.C.); *Los Angeles Unified School District v. Owens-Corning Fiberglass, et al.,* Case No. 0440317 (Superior Court for County of Los Angeles, filed January 27, 1983); *Hopkins County Board of Education v. National Gypsum Co., et al.,* 83–CI–306 (Hopkins County Circuit Court of Kentucky); *Huntsville City Board of Education v. National Gypsum Co., et al.,* Civ. 83–325L (Madison County Alabama Circuit Court).

Allegations substantially similar to those raised in the above-enumerated postpetition suits have been sustained by other courts. *See, e.g., School District of Lancaster v. Asarco, supra,* where the court denied motions to dismiss both

compensatory and equitable claims for relief. And, although some schools may opt out of the nationwide class envisioned by these postpetition suits, there is a substantial possibility that should that class be certified, most schools would pursue their rights in that forum.

**4.** The Department of Education, in consultation with the EPA, itemized 1983 costs for abatement of the school problem through various procedures and estimated that "the average cost of abatement per school building would be $100,000". *See* U.S. Department of Education, *Asbestos in the Schools: A Report to Congress* 26–27. Calculating that there were an estimated 14,000 schools involved, the Report concluded that the total estimated cost of asbestos removal would be $1.4 billion. *Id.* at 27. Another projection based on the example of abatement procedures used in the New York City School System forecasts that $500 million can be estimated as the total potential amount of asbestos-related property damage suffered by schools.

this proceeding. The filing also triggered the acceleration of more than $275 million in unsecured public and institutional debt which had not been due prior to the filing. Upon a dismissal of this petition, Manville may be liable in the amount of all of the above-described real debts, plus interest. Manville's present holdings of cash and liquid assets would be insufficient to pay these obligations and, as noted above, its insurance carriers have repeatedly expressed their unwillingness to contribute to the payment of this debt. Thus, upon dismissal, Manville would become a target for economic dismemberment, liquidation, and chaos, which would benefit no one except the few winners of the race to the courthouse. The economic reality of Manville's highly precarious financial position due to massive debt sustains its eligibility and candidacy for reorganization.

█ In short, there was justification for Manville to elect a course contemplating a viable court-supervised rehabilitation of the real debt owed by Manville to its real creditors. Manville's filing did not in the appropriate sense abuse the jurisdiction of this Court and it is indeed, like the debtor in *Bonded Mailings,* a "once viable business supporting employees and unsecured creditors [which] has more recently been burdened with judgments [and suits] that threaten to put it out of existence.". . . *Bonded Mailings,* 20 B.R. at 785. Thus, its petition must be sustained.

3. *That Tort Claims Are Dischargeable In Bankruptcy Is Further Indication That Manville Has Not Abused This Court's Jurisdiction*

Even those pre-Code cases where courts have declared an abuse of jurisdiction which at first blush appear analogous to Manville are distinguishable. For example, the court in *In re Cook,* 104 F.2d 981 (7th Cir.1939), held that there had been such an abuse where the debtor had filed to attempt to escape state court proceedings. However, in *Cook,* not only was the filing predicated by an eleventh hour attempt to avoid a state court accounting, but the court also

found that the debtor was neither insolvent nor unable to pay its debts as they matured. Similarly, the court in *Tucker v. American Syndicate,* 170 F.2d 939 (5th Cir.1948), *clarified,* 185 F.2d 863 (5th Cir.1950), declared an abuse of jurisdiction where the debtor had filed to avoid state court proceedings. However, in that case, the Fifth Circuit found that not only was the debtor not insolvent, but it had paid off debts not due so as to qualify as a debtor unable to pay its current debts. In contrast to the above two cases, it has not been established by any movant herein that Manville has the ability to manage in full all its present liquidated and unliquidated obligations.

Moreover, under the Code, unlike under the predecessor Act, state court tort claims are dischargeable in bankruptcy. Under the Act, for a claim to be discharged, it had to be both provable, *see* Old Act § 63, 11 U.S.C. § 103 (repealed 1978), and allowable, *id.* § 57, 11 U.S.C. § 93. Thus, tort claims which were contingent were generally held not provable. *See In re Magnavox Co.,* 627 F.2d 803, 805 (7th Cir.1980) (decided under the Old Act). Also, a contingent or unliquidated claim that had been proved could be allowed only if a liquidation or estimation did not "unduly delay the administration of the estate or any proceeding under this title." Act, § 52(d), 11 U.S.C. § 93(d). In contrast, under the Code, there is no longer a provability requirement. *See* B. Weintraub & A. Resnick, Bankruptcy Law Manual ¶ 5.01 (1980). With regard to allowability, Code Section 502(c) requires that the bankruptcy court estimate all unliquidated claims regardless of delay to administration of the estate with a resulting discharge of these claims. *See* 11 U.S.C. §§ 502(c)(1), (claims estimation), 524 (effect of discharge) and 1141 (discharge effect of plan confirmation). *See also In re Magnavox, supra,* 627 F.2d at 895 n. 5.; *In re UNR Industries, Inc.,* 725 F.2d 1111, 1116 (7th Cir.1984), where the Circuit declared: "[A] major change brought about by the Bankruptcy Reform Act of 1978 was to authorize the bankruptcy court to adjudicate claimants' rights under tort law, thus merging

the tort determination with the claim determination".

Moreover, District Judge Leval of the Southern District of New York has recently recognized the appropriateness of claims estimation of these tort claims in connection with appellate review of this Court's decision denying an expansion of the automatic stay to cover Manville's tort codefendants. He declared that "the bankruptcy judge will undoubtedly seek to design, with the cooperation of the claimants and the debtor, procedures for the adjudication or settlement of those [tort] claims in a rational consolidated fashion, whether in the bankruptcy court or elsewhere." *Keene Corporation v. Johns-Manville Corp.,* 31 B.R. 627, 628 (D.C.S.D.N.Y.1983).

Indeed, Manville has lodged a motion before this Court seeking to accomplish this very purpose. *See* footnote 1 *supra.* This motion coupled with Manville's currently proposed plan seeks to establish a claims-handling facility whose purpose would be to estimate asbestos-related claims in an expeditious fashion. According to the unilateral reorganization plan filed by Manville on November 21, 1983, this facility would consist, *inter alia* of a "no fault" system where victims would submit their claims to a medical screening panel and receive a predetermined amount for the injury specified with subsequent reevaluation not precluded. Thus, Manville recognizes that these traditionally state law tort claims may be liquidated pursuant to Code Section 502(c) as part of its first-filed reorganization plan.[5]

Accordingly, a filing so as to substitute bankruptcy court procedures for estimation of these claims in and of itself does not constitute an abuse of the bankruptcy court's jurisdiction. Because tort claims are now dischargeable under the Code, simply because a company's economic pressures are tort-related in nature instead of more traditional financial business woes does not demonstrate an abuse of jurisdiction. *See In re Alton Telegraph Printing Co.,* 14 B.R. 238 (Bkrtcy.S.D.Ill.1981), where the court held that the debtor newspaper was eligible for relief under the Code although the debtor would not have filed a Chapter 11 petition were it not for the libel judgment (grounded in tort) obtained by a creditor as well as other major libel claims then pending against the debtor. *See also In re Longhorn 1979–II Drilling Program,* 32 B.R. 923, 10 B.C.D. 1435, 1438 (Bkrtcy.W.D.Okl.1983), where the Court held that the petitioning creditors' tort claims against the involuntary debtor were sufficiently definite to justify sustaining the involuntary petition.

In sum, Manville is a financially beseiged enterprise in desperate need of reorganization of its crushing real debt, both present and future. The reorganization provisions of the Code were drafted with the aim of liquidation avoidance by great access to Chapter 11. Accordingly, Manville's filing does not abuse the jurisdictional integrity of this Court, but rather presents the same kinds of reasons that were present in *Financement, supra,* for awaiting the determination of Manville's good faith until it is considered under Code Section 1129(a)(3) as a prerequisite to confirmation or as a part of the cadre of motions before me which are scheduled to be heard subsequently. In this case, all creditors and equity holders of Manville have vigorously espoused their positions by means of committee or party in interest representation. This representation has protected their interests throughout the course of the past long and arduous 16 months. Now, with an anticipated appointment of a representative for all future claimants, *see* Decision No. 2, all interests will be more fully put forward and protected. The Code provides a forum in which these diverse and conflicting interests can be harmonized. The Asbestos Committee's motion to dismiss is thus denied in its entirety.

---

**5.** This Court will pass on the appropriateness of the specific details of the claims estimation procedure proposed by Manville if and when it passes on the confirmability of that plan. This Court is not indicating herein whether it approves of the contents of this proposed plan and its posited claims-estimation facility.

742

D. *The GAF, Whitman, and Co-defend-
ants' Motions to Dismiss the Petition
Must Be Denied*

■ The GAF, Whitman and Co-defendants' motions to dismiss must be denied because future claimants, whether or not they possess dischargeable "claims", possess a cognizable interest in these proceedings. This interest must be protected. *See* Decision No. 2 on correlated Manville matters. The motion filed by GAF to dismiss this petition raises only legal issues and turns on no factual determinations. It is based on the theory that because the claims of future asbestos claimants are not cognizable and dischargeable in bankruptcy, the *raison d'etre* for the filing is vitiated and thus the petition should be dismissed. As GAF declares in its statement of the case within its brief: "Such future 'liability' is not cognizable under the bankruptcy laws, and hence the same cannot be adjusted and discharged in these proceedings. The factual and legal predicate for the petition is therefore rendered a nullity and the same should be dismissed."

It is just this concern, which was also noted by the Asbestos Committee in its Reply Brief, that the analysis in Decision No. 2 responds to in establishing that future claimants are parties in interest to this reorganization case who must have their own legal representative to safeguard this keen and compelling interest. Because this Court finds that the claims of these asbestos-exposed claimants may survive the bankruptcy and look to be liquidated post-confirmation, the rights of these claimants will be significantly impacted by these proceedings. It is undeniable that these proceedings will result in a delivery system for Manville tort claimants, whether in the present questionably efficient tort system, a newly-created claims-estimation facility, or another form. Thus, the *raison d'etre* for the filing is not a nullity and these proceedings are not a useless exercise. In any event, even absent the appointment of a representative, the petition should be sustained because feasibility is an issue to be determined upon confirmation pursuant to Code Section 1129. Accordingly, the separate motion to dismiss filed by GAF is denied.

The motion by Whitman likewise must be denied. Like the GAF motion, the Whitman motion is premised on a mechanistic interpretation of the provisions of and commentary to the Code to the effect that the future claims are too contingent to be cognizable "claims" under the Code. As Whitman states in its brief: "Movant submits that the hypothetical projected claims posited by the debtor in its petition, do not satisfy the standards articulated by the amended Act, since . . . they do not constitute 'claims' in any cognizable sense of the word." By reason of the foregoing, and this Court's analysis contained in the synchronously issued Decision No. 2, future claimants are significantly impacted by these proceedings, which proceedings are sustainable even without a recognition of the cognizability of their claims to their inevitable detriment. Accordingly, the *raison d'etre* for the filing remains viable and Whitman's motion to dismiss must be denied. Whitman, like the other movants, will have to abide this Court's determination of whether the plan which emerges deals fairly and equitably with all creditor groups pursuant to the stringent confirmation requirements of Code Section 1129(a) and (b). *See generally* discussion of cognizability of future claims in dicta by the Seventh Circuit in *In re UNR, supra.*

The Co-defendants motion to dismiss the petition similarly must be dismissed as it too is predicated on the theory that future claims are not dischargeable in a Chapter 11 proceeding. The codefendants declare: "[W]e demonstrate that the object and purpose of Manville's petition for reorganization are inconsistent with the Bankruptcy Code." The Equity Holders Committee's scathing criticism with regard to the Whitman motion that "only the author of Alice in Wonderland might simply declare future claims out of existence in the face of massive evidence to the contrary" applies equally to the Codefendants' motion.

Regarding the GAF, Whitman and Co-defendants' motions, it should be noted that it is indeed possible that a liquidating plan will eventuate. As stated earlier, the type of plan which emerges, *i.e.,* whether or not it treats with future claimants fairly, if at all, is irrelevant to the threshold determination made by this Court today as to the propriety or "good faith" of Manville's filing. These pejorative considerations are more appropriately left to the decision on confirmability of a concrete plan, as applied to a plan proponent, under Section 1129 of the Code.

## IV. *Conclusion*

For the reasons set forth above and in Decision No. 2 on the Motion to Appoint a Legal Representative for Future Claimants, all four of the motions to dismiss the Manville petition are denied in their entirety.

It is SO ORDERED.