In re JOHNS–MANVILLE
CORPORATION, et al.,
Debtors.

STATE GOVERNMENT CREDITORS'
COMMITTEE FOR PROPERTY
DAMAGE CLAIMS, Appellant,

v.

Robert B. McKAY, Thomas F. Eagleton,
D. Reid Weedon, Jr., as Trustees of the
Manville Property Damage Settlement
Trust; Creditors' Committee for Asbes-
tos Related Property Damage School
Claimants; and Big City Property
Damage Creditors Committee; Appel-
lees.

No. 1385, Docket 90–5016.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1990.

Decided Nov. 26, 1990.

See also 896 F.2d 1384.

**122**

Robert Somma (Gayle M. Merling, Goldstein & Manello, Boston, Mass., of counsel), for appellant.

George A. Davidson (Theodore V.H. Mayer, Sean F. Reilly, Thomas P. Higgins, Hughes Hubbard & Reed, New York City, of counsel), for appellees Robert B. McKay, Thomas F. Eagleton, and D. Reid Weedon, Jr., as Trustees of the Manville Property Damage Settlement Trust.

Ellen P. Chapnick, New York City, (Morton J. Marshack, Wolf Popper Ross Wolf & Jones, Attorneys for the Creditors' Committee for Asbestos Related Property Damage School Claimants, Victor A. Kovner, Corp. Counsel of the City of New York, Attorney for the Big City Property Damage Creditors Committee, New York City, of counsel), for Appellees Creditors' Committee for Asbestos Related Property Damage School Claimants and Big City Property Damage Creditors Committee.

Stephen J. Nolan (Nolan, Plumhoff & Williams, Chartered, Towson, Md., of counsel), for Baltimore County, Md. and Anne Arundel County, Md., amici curiae.

Before ALTIMARI and MAHONEY, Circuit Judges, and POLLACK, District Judge.*

MAHONEY, Circuit Judge:

The State Government Creditors' Committee for Property Damage Claims (the "State Committee") appeals from an order and judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge,* entered March 16, 1990. The district court's order and judgment affirmed an order of the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, *Chief Judge,* dated February 26, 1990 that authorized the temporary suspension of the operations of a claims resolution facility (the "PD Facility") established to resolve asbestos-related property damage claims against Johns–Manville Corporation and certain of its subsidiaries (collectively "Manville") pursuant to the Manville Property Damage Settlement Trust (the "PD Trust").

Manville's Second Amended and Restated Plan of Reorganization (the "Plan") established two trusts; the PD Trust at issue in this appeal, the affairs of which are conducted by three trustees (the "PD Trustees"), and a separate trust for the benefit of asbestos-related personal injury claimants against Manville (the "PI Trust"). The PD Trustees moved before the bankruptcy court to suspend the operations of the PD Facility as of October 31, 1992, at which date the PD Trust would not, for the indefinite future, have funds to pay claims. The trustees sought thereby to free an estimated $35.25 million in projected administrative expenses of the PD Facility and use that money instead to pay claims established against the PD Trust. The bankruptcy court granted the application, and the district court affirmed the ruling of the bankruptcy court.

The State Committee contends on appeal that these rulings authorized a modification of the Plan that violates 11 U.S.C.

---

* The Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

§ 1127(b) (1988), and that in any event they were an abuse of discretion because holders of claims not perfected prior to the October 31, 1992 suspension of the PD Facility would be irreparably harmed by that suspension with regard to the ultimate establishment and payment of their claims. Appellees defend the rulings on the merits; the PD Trustees additionally contend that this appeal should be dismissed for lack of jurisdiction because it was taken from an interlocutory, rather than final, order.

We conclude that we have appellate jurisdiction, and affirm the district court's order and judgment affirming the bankruptcy court's order authorizing suspension of the operations of the PD Facility.

### Background

This appeal arises out of reorganization proceedings under chapter 11 of title 11 of the United States Code initiated by Manville's filing of a petition for reorganization on August 26, 1982.[1] The Plan, which was intended to amend, modify, and supersede earlier proposed reorganization plans, was proposed, confirmed by the bankruptcy court, and consummated during these proceedings.

The PD Trust was established for the benefit of schools, colleges, hospitals, governmental bodies, and other persons and entities (the "Claimants") seeking recovery in the Manville bankruptcy for property damage due to asbestos and asbestos-containing products manufactured and/or sold by Manville, and is governed by New York law. According to the Claims Resolution Guidelines (the "PD Guidelines") that were annexed to the agreement establishing the PD Trust, the PD Facility "provide[s] the exclusive method for the disposition and payment of [p]roperty [c]laims [ ] against the PD Trust as provided in the Plan." The PD Guidelines govern "[d]eterminations as to the allowance and payment of [property] claims ... [and] ... are designed to provide a no-fault, non-litigated, low transaction cost method of effectuating

the consensual settlement of [p]roperty [c]laims asserted against [Manville]." Supplementary "Allowance Procedure and Distribution Guidelines" (the "Allowance Guidelines") address the sequence for allowance and payment of approved claims.

The PD Trust received substantial cash and insurance settlement proceeds in its early years of operation, but will not receive significant additional funds until the PI Trust no longer requires funds from Manville to pay personal injury claimants. Thereafter, the PD Trust will be entitled to receive from Manville twenty percent of its annual profit, assuming that Manville is still in business and profitable.

Pursuant to the PD Guidelines, the PD Facility receives and reviews documentation of asbestos property damage claims, determines the allowed amounts of claims, and makes distributions thereon from assets of the PD Trust. The Allowance Guidelines dictate timetables for the review and periodic payment of claims. Claims are reviewed and allowed in "cycles" determined by their filing dates. The first cycle encompassed six months from the activation of the PD facility; subsequent cycles cover twelve months. No payment on a claim filed in a given cycle may be made until all claims filed in that cycle have been allowed or disallowed. At the close of each cycle, the funds remaining in the PD Trust after the creation of a specified reserve are paid to holders of allowed claims. The unpaid balances due such holders, together with newly filed claims, become part of the claims payable in subsequent cycles. The first cycle ended on October 31, 1989, and payments to the first cycle Claimants were scheduled to be completed by March, 1990.

The Plan was confirmed on December 22, 1986. Subsequently, but prior to the Plan's consummation, the PD Trustees, anticipating a possible "drought" period during which the PD Trust would incur administrative expenses but would lack the wherewithal to pay claims, sought and obtained from the bankruptcy court an order, en-

---

1. As to the history of these proceedings, see *Kane v. Johns–Manville*, 843 F.2d 636, 639–41 (2d Cir.1988); *In re Johns–Manville Corp.*, 824 F.2d 176, 178–79 (2d Cir.1987); *In re Johns–Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y.), *appeal denied*, 39 B.R. 234 (S.D.N.Y.1984).

tered October 28, 1988, which provided in pertinent part:

[A]t any time after the expiration of the time for the filing of claims in the first allowance cycle and prior to the payment of any claim filed in the first allowance cycle, the PD Trustees are authorized to apply to this Court, upon adequate notice to all interested parties, for relief necessary to permit the PD Trust to fulfill its purposes under the Plan, including application ... (2) for approval of a plan providing for the modification or suspension of operations of the PD Claims Resolution Facility during cycles in which the PD Trust is not expected to have sufficient income to make payments on claims while maintaining all authorized reserves, and ... after hearing on 30 days' notice to [interested parties] the Court may grant an adequately documented application for such relief.

In accordance with the quoted order, the PD Trustees applied to the bankruptcy court on January 18, 1990 for a suspension of the operations of the PD Facility upon completion of the fourth allowance cycle on October 31, 1992. The supporting affidavit of Kurt H. Schaffir, executive director of the PD Trust, stated that after October 1992 the PD Trust could expect no significant income until the PI Trust no longer required Manville funds to pay claims, and that the chief financial officer of the PI Trust had advised Schaffir that the PI Trust would require Manville funds "well beyond the year 2024." Further, Schaffir opined that the PD Trust would have to set aside an operating reserve of $35.25 million to cover operating expenses of the PD Trust and Facility through 2024, which reserve would accordingly have to be withheld from the payment of first-cycle claims scheduled for March 1990, absent relief from the anticipated thirty-year operating expenses.

The State Committee and the Hospitals, Colleges, and Universities Property Damage Group (the "Hospitals Group," which is not a party to this appeal) objected to the application, contending that the temporary suspension would "irreparably harm holders of unfiled Property Claims." Noting that the PD Facility had theretofore routinely required that Claimants provide additional information after submitting claims, the State Committee and Hospitals Group concluded:

Under the Guidelines, a Property Claim for which the claimant cannot provide additional documentation deemed by the Facility to be necessary will automatically be disallowed. The result of a thirty-year suspension of claims processing will inevitably be the disallowance of meritorious claims that would have been allowed had they been addressed promptly after they were submitted.

The Creditors' Committee for Asbestos Related Property Damage School Claimants ("Schools Committee") and Big City Property Damage Creditors Committee ("Big City Committee"), which together make up the large majority of claimants, did not join in this opposition. Although they "share[d] the very serious and real concerns of the States and the Hospitals," they concluded in their response to the application for suspension:

We agree with the PD Trustees' assertion that the interests of the property damage claimants ("PD Claimants") will be better served by the distribution of $35 million to PD Claimants who file claims in the first four cycles than by the reserve and possible use of those funds to maintain a claims-review bureaucracy when there is no money for payment of claims and payment at anytime [sic] after the first four cycles is somewhat speculative.

The Schools Committee and Big City Committee expressly reserved, however, the right to object to the PD Trustees' detailed plan for suspension of the PD Facility when thereafter submitted.

In response to the objections and concerns raised by the various creditors' committees, the PD Trustees adopted "the claimants' suggestion that a supplemental instruction package be prepared to help claimants avoid errors which have been encountered frequently to date", and further proposed that "the functions of receiv-

ing and date-stamping claims should continue even while processing is suspended" in order to relieve claimants from the burden of storing records.

After a hearing on the application on February 20, 1990, the bankruptcy court entered an order granting the application, as modified. The order directed "that the PD Trustees shall plan operations of the [PD Facility] in the expectation that the Facility will suspend operations after the end of the fourth allowance cycle," and further provided:

> [T]he PD Trustees shall prior to the commencement of the fourth allowance cycle submit for approval of the Court ... a detailed plan of how the PD Trust shall operate during the period of suspension of the Facility[,] ... [which plan] shall provide, among other matters, for receiving and date-stamping the receipt of claims during the period of suspension, and for dissemination to claimants of a detailed manual designed to assist claimants in filing complete and accurate claims, including information on how to avoid most frequently encountered deficiencies in claims filed prior thereto.

The State Committee appealed to the district court pursuant to 28 U.S.C. § 158(a) (1988) and sought a stay of the bankruptcy court order pending appeal, attempting thereby to preclude any first-cycle distribution without the prior establishment of a $35.25 million reserve for future operating expenses, which would in turn prevent distribution of that sum to the first-cycle Claimants. The district court did not rule on the motion for a stay, but instead accelerated the hearing on the merits of the appeal. At the conclusion of the hearing, the court delivered an opinion affirming the order of the bankruptcy court.

The district court characterized the bankruptcy order as approving a "lowering of the voltage in the processing of claims" by the PD Facility. The court rejected the State Committee's contention that the bankruptcy court order constituted an impermissible modification of the Plan within the meaning of 11 U.S.C. § 1127 (1988), concluding instead that it was "entirely consistent with and pursuant to the provisions of the reorganization plan."

Accordingly, by order and judgment entered March 16, 1990, the district court: (1) affirmed the bankruptcy court order; but (2) stayed that order and the district court's affirmance thereof "on an interim basis through and until 6:00 pm on March 19, 1990;" and (3) further ordered "that the Trustees of the [PD] Trust shall not make any distribution of funds to First–Cycle Claimants until after the expiration of the interim stay."

The State Committee thereupon appealed to this court pursuant to 28 U.S.C. § 158(d) (1988), and moved for a stay of (1) the order permitting suspension of the operation of the PD Facility and (2) the distribution of $35.25 million. An interim order of this court entered March 15, 1990 preserved the status quo until the State Committee's motion could be heard by a panel of this court. By order entered March 20, 1990, the motion was granted "only until argument of the appeal," which was expedited. An order entered March 28, 1990 further provided that:

> the Trustees are required, until oral argument of this appeal is held before this Court, to hold in reserve, from the cash and liquid assets otherwise included in the computation of amounts available for payment on the first-cycle payment date, the amount of $35.25 million in addition to reserves the Trustees are otherwise required to maintain.

At the argument of this appeal on May 7, 1990, it was further ordered "that the oral motion to continue the Stay and other requirements of the court's previous orders of March 20, 1990 and March 29 [sic], 1990 be and it hereby is granted until decision of this appeal."

### Discussion

#### A. *Jurisdiction.*

As a threshold matter, we must address the question of appellate jurisdiction. Appellate jurisdiction in this case is governed by 28 U.S.C. § 158 (1988), which provides in relevant part:

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

. . . .

(d) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

The PD Trustees contend that the appeal should be dismissed for lack of jurisdiction because it was taken from an interlocutory, rather than final, order.[2] The trustees point out that "[a]lthough interlocutory orders of bankruptcy courts may be appealed to the district courts 'with leave of the court,' *see* 28 U.S.C. § 158(a), the jurisdiction of the courts of appeals is confined to 'appeals from all *final* decisions, judgments, orders, and decrees' of district courts sitting in review of bankruptcy courts, *id.* § 158(d) (emphasis added)." *Bowers v. Connecticut Nat'l Bank*, 847 F.2d 1019, 1021 (2d Cir.1988).[3] We conclude, however, that the district court order and judgment from which appeal is taken are final, and accordingly appealable.

■ As we have observed, "[t]he nature of bankruptcy itself adds special considerations to an appellate court's inquiry into finality." *Bowers*, 847 F.2d at 1022. The finality requirement is less rigidly applied in bankruptcy than in ordinary civil litigation, and "orders in bankruptcy cases may be immediately appealed if they finally dispose of *discrete disputes within the larger case.*" *In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir.1983); *see also In re Johns–Manville Corp.*, 824 F.2d 176, 179 (2d Cir.1987) (order final if conclusively determines a separable dispute) (quoting *Saco*, 711 F.2d at 444–46); *Maiorino v. Branford Savings Bank*, 691 F.2d 89, 93 (2d Cir.1982) (single bankruptcy may involve multiple "final" decisions). *But see In re Magic Circle Energy Corp.*, 889 F.2d 950, 953 (10th Cir.1989) (normal finality rules apply to appeal of district court rulings in bankruptcy cases). Moreover, "[t]he finality of a decree is not impaired because some future order of the court may become necessary to carry it into effect." *In re Moody*, 817 F.2d 365, 368 (5th Cir.1987).

■ An inquiry into appellate jurisdiction under section 158(d) consists of two steps:

First, we must determine whether the underlying decision of the bankruptcy court was final or interlocutory. Intertwined with this determination is the procedural status of the district court's appellate review—*i.e.*, whether appeal was taken as of right or under the discretionary 'with leave' provision of section 158(a). If the decision was final, we must then ask whether the district

---

**2.** The Schools Committee and the Big City Committee apparently do not join in this argument.

**3.** Despite *Bowers'* flat statement that section 158(d) review of *final* district court decisions provides the sole avenue for appeal from decisions by district courts sitting in review of bankruptcy courts, it should be noted that the decisions of this circuit treat inconsistently the question whether, in addition, appeal from *interlocutory* decisions by district courts sitting in review of bankruptcy courts is available pursuant to 28 U.S.C. § 1292(a) and (b) (1988). *Compare, e.g., LTV Corp. v. Farragher (In re Chateaugay Corp.)*, 838 F.2d 59, 62–63 (2d Cir.1988) ("while we have recognized the applicability of section 1292 to determinations made by a district court sitting in bankruptcy, *see In re Feit & Drexler, Inc.*, 760 F.2d 406, 411–13 (2d Cir.1985), we believe that section 158(d) remains the exclusive basis for jurisdiction for decisions entered under paragraph [ ] (a) ... of section 158") *with NLRB v. Goodman (In re Goodman)*, 873 F.2d 598, 601–02 (2d Cir.1989) (where district court, sitting in appellate review of bankruptcy court, entered order that refused to dissolve bankruptcy court's injunction, order appealable under section 1292(a)(1)). In any event, since we conclude that review is available herein pursuant to section 158(d), we need not consider any possible applicability of section 1292(a)(1).

court's disposition independently rendered the matter nonappealable.

*Bowers*, 847 F.2d at 1022.

The Trustees point out that the bankruptcy court's order provided for future submission for approval of the court prior to commencement of the fourth allowance cycle, on ninety days notice to interested parties, of "a detailed plan of how the PD Trust shall operate during the period of suspension of the Facility." The plan was to include provisions "for receiving and date-stamping the receipt of claims during the period of suspension, and for dissemination to claimants of a detailed manual designed to assist claimants in filing complete and accurate claims." The PD Trustees then contend that the order "by its own terms requires a new application and contemplates a new, more detailed order to be entered prior to suspension of the claims processing," and thus is not final. We disagree, and conclude that the bankruptcy court decided, with the requisite finality, the discrete issue whether the suspension of the operations of the PD Facility was a prohibited modification of the Plan and, if not, was otherwise appropriate. *See Banc-Texas Dallas, N.A. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 880 F.2d 1509, 1512–13 (2d Cir.1989) (commitment by bankruptcy court to reconsider denial of relief from automatic stay in one year, and requirement that debtor set aside fund with respect to claim of creditor seeking relief from automatic stay, did not render denial nonfinal; ruling therefore final and immediately appealable).

The bankruptcy court's order clearly determined that there would be a suspension of operations of the PD Facility after the end of the fourth allowance cycle, thereby permitting the immediate distribution to claimants of the $35.25 million estimated to be otherwise required to operate the PD Facility. Given the order's premise that the PD Facility is not going to continue to operate in the manner originally provided, what remain to be "fine tuned" are the conditions under which the PD Facility will preserve claims during the period of suspended activity. Nothing in the order of the bankruptcy court or its affirmance by

the district court indicates any anticipation that the basic decision to suspend operations will be reconsidered when the PD Trustees submit their "detailed plan" for suspension. Even more fundamentally, it would be practically impossible to reconsider the issue of suspension at that juncture, since the funds that would have to be reserved in order to make such a suspension avoidable would already have been distributed to Claimants under the terms of the bankruptcy and district court orders.

The procedural posture of the district court's appellate review supports our conclusion. The State Committee appealed to the district court from the bankruptcy court's order "pursuant to 28 U.S.C. § 158(a) and Bankruptcy Court Rule 8001." Rule 8001(a) deals only with appeals as of right from final orders. An appeal from an interlocutory order pursuant to section 158(a) is governed by rule 8001(b), in which event section 158(a) requires "leave of the court" and rule 8001(b) requires a motion for leave to appeal. The State Committee did not apply for, nor did the district court grant, leave to appeal.

Finally, nothing in the district court's disposition independently rendered its order nonappealable. The district court simply affirmed the bankruptcy court order. In light of the treatment of the matter by both the parties and the courts, we conclude that the discrete issues whether to suspend operation of the PD Facility, or whether such suspension would constitute a prohibited modification, were finally determined, and that the district court's order is accordingly appealable under section 158(d).

## B. *The Merits.*

■ Turning to the merits, the State Committee makes two arguments: first, that suspension of the operations of the PD Facility was impermissible as a matter of law; and second, that in any event, the bankruptcy court's approval of the suspension was an abuse of discretion.

The State Committee argues that the proposed suspension of the PD Facility im-

permissibly modifies a substantially consummated plan in violation of 11 U.S.C. § 1127(b) (1988), which provides in relevant part: "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan. . . ." This provision is interpreted to prohibit modification of a reorganization plan that has been substantially consummated. *See, e.g., In re Olsen*, 861 F.2d 188, 190 (8th Cir.1988).[4]

The PD Trustees do not contest the State Committee's position that the Plan, whose consummation date was November 28, 1988, has been substantially consummated. In any event, we need not address the question of consummation, because we agree with the district court that "the proposed lowering of the voltage in the processing of claims is not a Modification pursuant to the provisions of the above-cited bankruptcy statute."

Section 1127 does not define the term "modification," nor does the definitional section (§ 1101) of chapter eleven. Accordingly, we turn to the Plan for guidance. The Plan includes "Modification" among the phrases defined in its glossary, which states: "*Modification* has the meaning assigned to it in Section 6.03 of the PD Trust Agreement." Section 6.03 does not expressly define the term; rather this section describes the method by which Manville and the PD Trustees "may modify, supplement, or amend this PD Trust Agreement." The PD Guidelines and Allocation Guidelines may not be modified under this section, which specifies that "[t]he Company shall have the exclusive right to propose a Modification."

In contrast, the Plan contemplates that the PD Trustees, acting alone, may make other needed adjustments. The definition of the PD Facility, included in the Plan's glossary, provides in pertinent part:

[T]he PD Trustees, by a majority vote after consultation with the Company, representative counsel for the PD Beneficiaries selected by the PD Trustees and any other interested parties whom the PD Trustees desire to consult, may amend, delete or add to any of the procedural provisions with respect to the operation of the PD Claims Resolution Facility except for Modifications, *provided* that no such amendment, deletion or addition may affect any of the substantive provisions set forth in [the PD Guidelines]. . . .

Further, the PD Guidelines state that "[t]he [PD] Facility may establish procedures designed to reduce administrative costs, which do not prejudice Claimants' substantive rights." Thus, the Plan expressly grants the PD Trustees discretion to suspend operation of the PD Facility, provided that such suspension constitutes a procedural, rather than substantive, change.

The State Committee insists that the suspension constitutes a substantive amendment to the Guidelines. Applying an "outcome-determinative test," the State Committee argues that in view of the thirty-year time lapse, the proposed suspension "would effectively destroy claimants' abilities to secure allowance of their claims."[5]

In our view, the suspension is more properly deemed, as suggested by the district court, to be "a variation . . . with respect to the timing and intensity of claim process-

---

4. "Substantial consummation" is defined in 11 U.S.C. § 1101(2) (1988) to mean:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

5. At least as presently written, it would appear unlikely that the Plan would result in disallowances for inadequate documentation as a result of the contemplated delay in reviewing post–1992 claims. The PD Guidelines provide that upon submission of a claim, "[i]f additional documentation is required in order to evaluate the Property Claim, the Facility shall notify the Claimant in writing within 60 days of receipt of the PD Claim Form by the Facility." Presumably, the PD Facility, rather than a Claimant, would normally incur any prejudice resulting from failure to give the required notice.

ing." The substantive rights of the Claimants remain unchanged, and we see no basis for the State Committee's prediction that the suspension will result in the wholesale frustration of legitimate claims. Rather, we agree with the district court's assessment:

It is clear that when the plan was adopted the parties were embarking into unknown territory and that the operation of the Manville claims facility might require adjustments and changes as additional knowledge and experience were gained. Thus, we find that the [bankruptcy court's] order is entirely consistent with and pursuant to the provisions of the reorganization plan and that there was no error of law by the bankruptcy court in approval of the order.

Finally, the Plan provides ample authority for the bankruptcy court's action. Under section 10.1(G) of the Plan, the bankruptcy court retains jurisdiction for a number of purposes, including "[t]o enforce and administer the provisions of the Plan, and, to the extent expressly provided therein, the Exhibits thereto and the Annexes to the Exhibits." The PD Guidelines are set forth in Annex B to the PD Trust Agreement, which is Exhibit D to the Plan. The Allowance Guidelines constitute Exhibit A to Annex B. The October 28, 1988 order gave the Trustees specific authority to return to the bankruptcy court to apply

for relief necessary to permit the PD Trust to fulfill its purposes under the Plan, including application ... (2) for approval of a plan providing for the modification or suspension of operations of the PD Claims Resolution Facility during cycles in which the PD Trust is not expected to have sufficient income to make payments on claims while maintaining all authorized reserves.

That order, taken in conjunction with section 10.1(G) of the Plan, clearly contemplates the action taken by the PD Trustees in returning to the bankruptcy court for approval of the proposed suspension.

■ Having concluded that there was no legal impediment to the suspension of operations of the PD Facility, we turn to the question whether the bankruptcy court's ruling that the suspension would be in the best interest of the Claimants was an abuse of the court's discretion. At the hearings on the suspension application, the bankruptcy court stated:

I do find [the PD Trustees'] suggestion, as modified today and on this record, as accommodating the essentials of the objections which have already been filed and adopting the suggestions in that regard, leaving open the detailing of the final plan. And under all of those circumstances I think the application, to the extent it recognizes that a suspension or a lowering of the voltage of the operation or the dynamics of the operation, substantially is in the best interests of all the beneficiaries. And to that extent I will grant the application....

As noted by the district court in reviewing the bankruptcy court's decision, the bankruptcy court balanced "the interests of the State Committee in having reduced to a liquidated amount at the earliest possible date claims by members of this committee ... against the interest of those in the first cycle who would be the recipients of an immediate distribution of funds." The bankruptcy court carefully scrutinized the proposed suspension, and mandated measures to safeguard the rights of the Claimants. In our view, far from constituting an abuse of discretion, the outcome was a practical and economically sensible balancing of the interests of all parties involved.

### Conclusion

We affirm the order and judgment of the district court affirming the order of the bankruptcy court authorizing suspension of the operations of the PD Facility. The order of this court entered May 7, 1990, continuing the stay imposed by the court's previous orders entered March 20 and 28, 1990 pending the decision of this appeal, is vacated.