**In re The MURALO COMPANY, INC.,**
**A New Jersey Corporation, et al.,**
**Debtors.**

**No. 03–26723 (MS).**

United States Bankruptcy Court,
D. New Jersey.

Dec. 4, 2003.

Frank Vecchione, Esq., Brian McMahon, Esq., Gibbons, Del Deo, Griffinger & Vecchione, PC, Newark, NJ, for Debtors.

Bruce Buechler, Esq., Lowenstein Sandler, PC Roseland, NJ, for Official Committee of Asbestos Claimants.

Margaret Lambe Jurow, Esq., United States Department of Justice, Newark, NJ, for U.S. Trustee.

Terri Jane Freedman, Esq., Porzio, Bromberg & Newman, P.C., Morristown, NJ, Co-counsel to the Official Committee of Unsecured Trade Creditors of the Muralo Company, Inc.

## *OPINION*

MORRIS STERN, Bankruptcy Judge.

### *FACTUAL BACKGROUND*

The Muralo Company, Inc. and its affiliate, Norton & Son of California, Inc. ("Muralo" and "Norton," respectively, and "Debtors" collectively), filed their chapter 11 bankruptcy petitions on May 20, 2003. Their cases (jointly administered per this court's order of May 23, 2003) are the subject of a motion for dismissal based upon purported "bad faith" filings. The movant is the Official Committee of Asbestos Creditors, appointed by this court's order of June 30, 2003.[1]

---

1. This court has jurisdiction pursuant to 28 U.S.C. 157 and 1334 and the "District Court

This jointly administered case has its origins in asbestos mass tort. However, Debtors' position at the earliest stage of the case was that they "have not sought the protection of the Court because they are in need of financial restructuring, but instead, have been forced into these chapter 11 cases as a result of an avalanche of asbestos related complaints which have been filed improperly against one or both of them in state courts throughout the country...." Application for Designation as Complex Chapter 11 Case, ¶ 4 (Docket entry no. 2, main case). This statement of purported rationale has been seized upon and is challenged by the Asbestos Committee as being "cause" for dismissal pursuant to 11 U.S.C. 1112(b),[2] as amplified by *In re SGL Carbon Corporation*, 200 F.3d 154 (3d Cir.1999). More specifically, the motion challenges Debtors' filings as a tactical precursor to an adversary proceeding for declaratory judgment (the "Adversary Proceeding"), which would have this court hear successor liability issues said to be at the threshold in the thousands of product liability cases now pending against one or both of Debtors in state courts throughout the country.[3]

Debtors originally estimated that more than 60,000 asbestos-related claims against one or both of them were pending in the state cases. Though the numbers may have been refined and reduced somewhat, it is clear that the thrust of these thousands of "Synkoloid Asbestos Actions" is to hold Debtors liable for certain personal injuries (the "Synkoloid Asbestos Claims"). These injuries purportedly arise out of the alleged exposure to certain Synkoloid products, including pipe adhesive compounds and the like. Muralo insists that the Synkoloid products contained asbestos *prior to* (but allegedly not after) Muralo's 1981 purchase of Synkoloid assets from The Artra Group, Inc. ("ARTRA"). ARTRA indemnified Muralo for pre 1981 product liability claims, as part of the 1981 asset sale transaction. However, ARTRA is now a debtor in a chapter 11 case pending in the Bankruptcy Court for the Northern District of Illinois. *Muralo*, 295 B.R. at 514.[4]

Because ARTRA assumed the defense of any Synkoloid Asbestos Claims for over twenty years, Debtors claim to have little or no information regarding the majority of the tens of thousands of Synkoloid Asbestos Actions pending on June 3, 2002. On that date ARTRA commenced its chapter 11 case and

General Order of Reference" of the United States District Court for the District of New Jersey, dated July 23, 1984.

**2.** The Asbestos Committee moves, in the alternative, for this court to abstain pursuant to 11 U.S.C. 305.

**3.** *See In re Muralo*, 295 B.R. 512 (Bankr.N.J. 2003) and its references to the record in both the Adversary Proceeding, 03–2008(MS), and main case; that record is relied upon *sub judice* and the finding of facts set forth in the earlier opinion is incorporated here.

**4.** *Muralo*, 295 B.R. at 514–15, adds the following:

The Adversary Proceeding, initiated on June 7, 2003, seeks a declaratory judgment that Debtors are not liable for any Synko-

loid Asbestos Claims, as defined in the Complaint, under any "successor liability," or analogous theory of liability. Each of the individually named defendants in the Adversary Proceeding (the "Synkoloid Asbestos Plaintiffs") is said to have filed a Synkoloid Asbestos Action in one of various state courts throughout the country against Muralo and/or Norton, as well as ARTRA and/or Synkoloid. The Synkoloid Asbestos Actions are alleged to be integrally related to this Adversary Proceeding in that both are said to center on whether Debtors have any liability for claims alleging injuries resulting from exposure to Synkoloid asbestos-containing products marketed prior to Muralo's purchase of Synkoloid assets.

abruptly ceased defending the Synkoloid Asbestos Actions naming Muralo.

*Muralo,* 295 B.R. at 515.

The affidavit of Muralo's Chief Financial Officer, Charles P. Lee, Jr., (Docket entry no. 286–13 in main case, hereinafter "Lee ¶ ___.") describes the financial picture of Debtors and the pressure that both AR-TRA's demurrer and thousands of pending asbestos cases had on these relatively small companies. For example:

> Since the Artra Petition Date [June 3, 2002], Muralo and Norton have been served with in excessive [sic] of 600 complaints in Synkoloid personal injury asbestos cases. Approximately one-third of these cases are amendments to previously served complaints which name Muralo or Norton or both as a successor(s) to Synkoloid. The balance of the post-Artra Petition Date complaints continued to name "Synkoloid, a division of Muralo." [Lee ¶ 12.]
>
> *Despite repeated requests to Artra after the Artra Petition Date, Artra was unable to supply Muralo with any comprehensive listing of the number of pending cases, the status of cases which had been tendered for defense by Muralo or even the identities of the defense lawyers who had been engaged to respond to these claims. In particular, Artra was unable to identify cases which had been tendered by Muralo for a defense but where the answers or other responsive pleadings were not due until after the Artra Petition Date. As a result, Muralo faced confusion and uncertainty about its status in thousands of active asbestos cases then pending in state courts throughout the county* [sic]. [Lee ¶ 14, emphasis added.]
>
> Muralo did attempt to directly engage several of the law firms that had been previously been engaged by Artra or its insures to defend claims against "Synko-loid, a division of Muralo" in the hopes that these defense lawyers would be familiar with claims which Muralo had tendered to Artra and which were not being defended after the Artra Petition Date. In several instances it was possible to reach *ad hoc* agreements to obtain papers or arrange for filing of answers and other pleadings. However, one or more of these firms took the position that Muralo was liable for all of Artra's then outstanding substantial defense costs. Upon information and belief, Artra owes its various defense counsel in excess of $2 million. Therefore, it was impossible for Muralo to simply take-over all of the cases against "Synkoloid, a division of Muralo" which had been tendered to Artra. *Rather, Muralo was forced to respond to ad hoc emergencies in chaotic fashion as they arose. It was often only through last minute attempts to obtain defaults or turn-over orders that Muralo even learned the status of particular cases.* [Lee ¶ 15, emphasis added.]
>
> Simply by way of example, on or about August 5, 2002, Muralo and Norton received notice that unless an answer was filed in a case styled *Mathew Scott and Judith Scott vs. ACand S, Inc. et al.* then pending in the Superior Court of California, Alameda County, by August 26, 2002, the plaintiffs would seek a default judgment in the amount of $81,000,000.00. [Lee ¶ 16.]
>
> *The seemingly endless string of emergencies continued (as did the sleepless nights for Muralo's management).* [Lee ¶ 18, emphasis added.]

Mr. Lee then provides more detailed examples of stop-gap efforts to deal with asbestos litigation emergencies. Lee ¶¶ 18–22. As to management distractions and cost, Lee goes on:

Responding to issues created by asbestos cases involving Synkoloid products pending in various state courts throughout the county [sic] in which Muralo or Norton was a defendant and where Artra and its network of defense lawyers were no longer protecting Muralo or Norton was, to say the least, *an extremely material distraction for Muralo's management and a drain on its finances.* Beginning in June 2002, it was necessary for me to devote a substantial amount, if not the majority, of my time to these issues. The entire senior management at Muralo was spending substantial time evaluating and responding to issues caused by the asbestos claims involving Artra's Synkoloid products. Furthermore, after the Artra Petition Date, substantial legal fees were incurred. It became necessary for Muralo to engage lawyers in numerous jurisdictions, including Texas, California and Mississippi. Between, June 2002 and May 2003 these local counsel billed Muralo a total of $165,000.00. In addition, Muralo's local bankruptcy counsel in the Artra case billed a total of $102,000.00 and Gibbons, Del Deo billed approximately $1,107,000.00. Despite these expenditures, it was impossible to have any confidence that Muralo's and Norton's interests were being protected in the tens of thousands of pending asbestos cases involving Synkoloid products throughout the county [sic] in which Muralo or Norton had been named in some way and where Artra and its network of defense lawyers were no longer protecting the interests of Muralo and Norton. *The next unforeseen default, trial or turnover order emergency was always right around the corner at all times.* [Lee ¶ 22, emphasis added.]

Moreover, Mr. Lee details the resistance of insurers to defend. Lee ¶¶ 23 and 24.

Similarly, Debtors' efforts in the ARTRA bankruptcy for relief under 11 U.S.C. 105 (for an injunction against asbestos litigation favoring, in that case, nondebtors Muralo and Norton) were resisted by the Synkoloid Asbestos Claimants and were stymied. Lee ¶¶ 25–27. In sum, Lee concludes:

> By May 2003, Muralo had: (i) spent almost a year attempting to get control of the cases that had been filed prior to the Artra Petition Date with only limited success; (ii) been served with over 600 new cases in which its insurance carriers had failed to develop a coordinated defense, (iii) expended over $1,300,000.00 (a staggering sum for our modest company) on legal fees, (iv) commenced litigation against its own insurance carriers relating to coverage disputes concerning the "Synkoloid claims," and (v) tried twice to secure injunctive relief in the Bankruptcy Court for the Northern District of Illinois but were vigorously opposed in each instance by the asbestos claimants. Therefore, the Debtors elected to seek the protection of the bankruptcy laws by filing their own Chapter 11 petition with this Court. [Lee ¶ 28.]

> *Muralo clearly does not have the financial ability to address the thousands upon thousands of "Synkoloid claims" spread all over the country. We came to this Court after all other efforts and solutions had failed and when we had no place else to turn in an effort to save our companies.* [Lee ¶ 29, emphasis added.]

All of these Muralo/Norton efforts to organize and defend multiparty complex litigation on, literally, thousands of litigation fronts, were being undertaken by relatively small entities.

Muralo is a third-generation closely-held family company. Muralo's capital stock is held by various members of three related families. Muralo presently has approximately 186 employees. In 2002, Muralo's had total sales of approximately $32,000,000.00 and net profits of less than $370,000.00. Although a private Subchapter S company, Muralo's net profits are not compressed by excessive salaries paid to owner/employees. No officer or employee of Muralo earns in excess of $200,000 per year. [Lee ¶ 2.] Norton produces and distributes paints and related products, including patching and repair products for Muralo. Certain of the patching and repair products produced by Norton for Muralo bear the Synkoloid brand. Norton's capital stock is held by various members of three related families. All of Norton's shareholders also own shares of Muralo. In 2002, Norton's total sales were approximately $2,000,000.00. [Lee ¶ 3.]

This quagmire has thus developed out of a 1981 asset purchase for approximately $1.7 million, a failed indemnity program, and successor liability concepts that, if allowed, would have Debtors responsible for claims arising from asbestos-containing products last sold by ARTRA (at least as alleged) years before the 1981 Muralo transaction. Debtors, as modest-sized companies ensnared by asbestos issues, worked for a year following ARTRA's bankruptcy filing (i) attempting to manage the asbestos litigation, (ii) seeking relief within the ARTRA case,[5] and (iii) litigating with its insurers for coverage of the asbestos personal injury case exposures.[6]

Notwithstanding the circumstances of Debtors' filings (which, as to Debtors' basic factual assertions, are essentially uncontested by the Asbestos Committee), this "bad faith" based motion is passionately pled by the committee:

> This is not a case about asbestos claims. Rather, *these Chapter 11 cases are simply a litigation tactic* designed by the Debtors for the sole purpose of obtaining a judgment from this Court declaring that the Debtors are not liable as successors in interest for asbestos liabilities relating to Synkoloid products. Rather than utilizing these cases to develop a plan of reorganization that takes into account the interests of all creditors, the Debtors' stated intent is to use this Court to disenfranchise asbestos claimants and preclude them from pursuing their state law tort claims in the

---

**5.** The affidavit of Karen A. Giannelli (Docket entry no. 286–1 in the main case) documents both (i) the year-long efforts of Debtors to have the stay against litigation in the ARTRA case extended to them per U.S.C. 105(a), and (ii) asbestos-claimants' opposition to those efforts.

**6.** This court has decided certain related insurance issues. By order of August 20, 2003 (Docket entry no. 13 in Adv. Pro. 03–2050), Debtors' state "coverage" case against its insurers, removed to the district court and referred here, was remanded to the Superior Court of New Jersey. Coverage questions, intricate and complex, are exemplified by the distinction between pre–1981 insurers and 1981 and later insurers. (The earlier insurers resist coverage for the after-acquired product line.) Moreover, by this court's earlier order (August 5, 2003 in the main case, Docket entry no. 187), assumption of an interim settlement with certain insurers was authorized. That settlement provides certain funds to Debtors to support the Adversary Proceeding, leaving ultimate coverage issues for future resolution. The record leading to each of these orders is incorporated here by reference. In sum, the court is advised by that record that Debtors maintained in the relevant period a *maximum* aggregate face value of about $70 million of pertinent liability coverage, disputed in substantial part and unavailable in some measure because of insurer insolvency.

tort system. This is not a basis for a Chapter 11 case.

. . . .

The Debtors' justification for this unprecedented application of the bankruptcy laws is simply that the Debtors cannot afford to litigate what they characterize as meritless asbestos personal injury and wrongful death claims in the tort system, and that they are better served by litigating with asbestos victims in this forum. *This Court should not allow the Debtors to hijack the Bankruptcy Court and Bankruptcy Code to create an alternative litigation forum designed to abridge the state law rights of asbestos victims.* The Debtors filed these cases solely to obtain a *tactical litigation advantage* that would simply be unavailable outside of bankruptcy. Such actions clearly constitute "bad faith" pursuant to well established Third Circuit precedent and warrant dismissal of these cases pursuant to Bankruptcy Code § 1112(b).

*See* Asbestos Committee's Memorandum of Law in Support of [Immediate Motion] (hereinafter "Memorandum of Law") at ¶¶ 2 and 3 (emphasis added).

Is dismissal of the petitions of Debtors, under the circumstances of this joint case, the intended effect of *SGL Carbon?* Or, is *that precedent being misread, if not abused by the Asbestos Committee in a tactical ploy of its own?*

### STANDARD FOR DISMISSAL BASED UPON LACK OF "GOOD FAITH"

 Bankruptcy Code 1112(b) provides for conversion or dismissal for cause in chapter 11 cases. The subsection's nonexclusive list of "for cause" bases has been augmented: "[i]n addition to granting re-

lief for one of the reasons enumerated in section 1112(b), the court may dismiss a chapter 11 case in its entirety for lack of good faith."[7] 7 COLLIER ON BANKRUPTCY (15th ed. rev.2002) (hereinafter "COLLIER") 1112.07. Though nowhere expressed in the Code, the good faith requirement is viewed as an historical verity. *See In re Little Creek Dev. Co.,* 779 F.2d 1068, 1071 (5th Cir.1986). *In re Victory Constr. Co., Inc.,* 9 B.R. 549, 551–57, 558 (Bankr. C.D.Cal.1981) catalogs the historical development of this good faith doctrine. *See* 7 COLLIER 1112–07[2] for a synthesis of purported "elements" of the good faith standard, though it is universally accepted that the necessary assessment must be made on a case-by-case basis, taking into account the totality of the circumstances of each particular case. *Id.*

7 COLLIER (1112.07[2]) slots this Circuit's bellwether case, *SGL Carbon,* as one exemplifying bad faith by "the filing of a case to avoid an obligation under circumstances in which the debtor is not in need of reorganization," and further edifies (at that point's note 13) with the following cryptic "blurbing" of *SGL Carbon:* "filing found to be a litigation tactic." Closer inspection of the case, however, reveals careful, fact-intensive review of the record below. The Third Circuit's own closing statement emphasizes its concerns as follows:

In reaching our conclusion, we are cognizant that it is growing increasingly difficult to settle large scale litigation. . . . We recognize that companies that face massive potential liability and litigation costs continue to seek ways to rapidly conclude litigation to enable a continuation of their business and to maintain access to the capital markets. As evidenced by SGL Carbon's actions

---

**7.** Conversion is not an option in cases where it is determined that *bad faith* is involved *in*

*the filing of the petition. In re SGL Carbon Corp.,* 200 F.3d at 159 n. 8.

in this case, the Bankruptcy Code presents an inviting safe harbor for such companies. *But this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings. Allowing SGL Carbon's bankruptcy under these circumstances seems to us a significant departure from the use of Chapter 11 to validly reorganize financially troubled businesses.*

*In re SGL Carbon Corp.,* 200 F.3d at 169 (citations omitted; emphasis added).

 *Sub judice,* since the good faith of the petition filing by Debtors has been put at issue, it is their burden to establish that the appropriate filing standard has been met. *Id.* at 162 n. 10. *SGL Carbon* thus dictates that Debtors must prove their eligibility to remain in chapter 11.

## DETERMINATION

### I. Comparison to SGL Carbon

*Effect of thousands of pending asbestos cases on operation of Debtors' business.*

 SGL Carbon was subject to a single class action antitrust lawsuit, six individual federal district court complaints, and one Canadian complaint. 200 F.3d at 156–57. Moreover, the litigation was anticipated, given an earlier Department of Justice investigation into alleged price-fixing by graphite electrode manufacturers including SGL Carbon. Nothing in SGL Carbon's litigation history is comparable to Debtors' circumstances—sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos personal injury cases following the bankruptcy of the twenty-year buffering indemnitor, AR-TRA. Thus, while SGL Carbon was operating in what seems to have been an ordinary course mode notwithstanding the pendency of the antitrust cases, Debtors

were, immediately prepetition, in readily understandable dire straits. *Compare* 200 F.3d at 162 ("[a]lthough there is some evidence that defending against the antitrust litigation occupied some officers' time, there is no evidence this 'distraction' posed a 'serious threat' to the company's well being"), *with* Lee ¶¶ 14–16, 18–22, 28 and 29. Management's sleepless nights, fear of high dollar value default judgments and turnover orders, and constant litigation-based chaos characterized Debtors' business environment in the year preceding the May 2003 recourse to chapter 11.

The Asbestos Committee here simply ignores the undeniable destructive effect on Debtors' everyday business operations wrought by their sudden immersion in the world of asbestos mass tort. Indeed, this court finds that this consideration, without more, is a significant factor evidencing the good faith of Debtors' filings. *See generally* Resnick, *Bankruptcy As a Vehicle for Resolving Enterprise—Threatening Mass Tort Liability,* 18 U. PA. L.REV. 2045 (2000) (hereinafter "Resnick").

*Magnitude of Debtors' exposure; potential insolvency.*

Assessment of the relative exposure of SGL Carbon to its antitrust litigation, versus Debtors' exposure to asbestos mass tort cases, calls for a review of the financial position of each enterprise. SGL Carbon was by any measure a substantial business venture, part of a worldwide network of the largest manufacturers of carbon and graphite products. That network ("SGL Carbon Group") was described as having more than twenty-eight manufacturing facilities in ten countries, generating sales in ninety countries. 200 F.3d at 157 n. 3. SGL Carbon, for its own account, had assets of $400 million, only $100,000 of which was encumbered; more than ninety percent of its $276 million in fixed and nondisputed liabilities were either owed to

or guaranteed by its parent. *Id.* at 163. And most significantly to the Third Circuit, in June 1998 before the December 1998 filing, "SGL Carbon's German parent ... recorded a charge ... of approximately $240 million as its 'best estimate' of SGL Carbon Group's potential liability in the criminal and civil antitrust litigation." 200 F.3d at 157 (footnote omitted).

This $240 million charge—viewed by the court as a "reserve"—was later increased (by an unstated amount) when SGL Carbon's parent pled guilty to criminal antitrust charges and was fined.[8] In any event, "[i]t is significant that, at the time of ... [the] Chapter 11 petition, the $240 million reserve was in place and untouched." 200 F.3d at 157 n. 4. SGL Carbon, a large enterprise in its own right, was obviously supported by the deeper pocket of its apparently huge parent.

In comparison to SGL Carbon, Debtors are tiny. Muralo's net profit for 2002 was $370,000, derived from gross sales of $32 million. Lee ¶ 2. Its petition, incorporated here by reference, shows total assets of $21,531,677.18 and liabilities (other than from unliquidated disputed asbestos claims) of $5,826,130.90. The corporation enjoys Subchapter "S" status for tax reporting purposes! Lee ¶ 2. Norton, with sales of $2 million in 2002 (Lee ¶ 3), has a petition-described net worth of less than $750,000. *These are small companies,* significant to the family that owns them,[9] their 200 or so employees,[10] their suppliers and servicers,[11] and the communities in which they operate, but without resources to weather modern asbestos mass tort litigation.[12] Nor is there readily available liability insurance. The $70 million of disputed coverage (aggregated over essentially a near generation of its operation), is an uncertain future funding source, and in any event could well be inadequate to account fully for Debtors' exposure to 60,000 claims.

In sum, SGL Carbon at the time of its filing was well-endowed with assets, had substantial net asset value, and could depend on the sheltering umbrella of its international network and huge parent. Debtors, as independent small businesses, by comparison, have quite limited resources (*compare, e.g.,* SGL Carbon's $400 million in assets with Debtors' combined $22 million), and no support system. Moreover, there is stark contrast between SGL Carbon's access to a $240 million reserve (and, seemingly more than that given the actions of its parent), with Debtors' disputed insurance coverage. In terms of jeopardy, the antitrust litigation faced by SGL Carbon was surely more contained and manageable at the time of filing,[13] than was the thoroughly chaotic

---

8. SGL Carbon's parent and the parent corporation's chairman pled guilty to charges of criminal antitrust in May 1999; they agreed to pay fines ($135 million for the entity and $10 million for the chairman). 200 F.3d at 157 n. 2.

9. "Muralo is a third-generation closely-held family company ... [its] capital stock is held by various members of three related families." Lee ¶ 2.

10. Lee ¶ 2.

11. In this regard, the Official Committee of Trade Creditors joins with Debtors in opposing the Asbestos Committee's motion to dismiss.

12. *See SGL Carbon Corp.,* 200 F.3d at 164, 168 and 169, contrasting SGL Carbon's litigation status with that of the asbestos mass tort circumstances described in *In re Johns–Manville,* 36 B.R. 727 (Bankr.S.D.N.Y.1984).

13. The Third Circuit, in comparing SGL Carbon's litigation status to that of Johns–Manville, said: "By contrast, SGL Carbon faces a known and finite number of suits." 200 F.3d at 169.

asbestos mass tort litigation which drove Debtors to file.[14]

The Third Circuit readily acknowledges that "[i]t is well-established that a debtor need not be insolvent before filing for bankruptcy protection." 200 F.3d at 163. But it is clear that the court considered SGL Carbon to be "financially healthy" at the time of filing and its "ability to meet its debts ... [as] but one of many factors compelling the conclusion it did not enter Chapter 11 with a valid reorganizational purpose." *Id.* at 164.

Debtors' situation is dramatically different: they are not "financially healthy."[15] Nor can Debtors operate normally, ignoring the phalanx of litigation they face. Hence, regardless of how close one would place Debtors to "insolvency" at this time, this court finds that their exposure to liability and *potential insolvency* are significant factors in evidencing the good faith of their bankruptcy filings.

*Nature of "litigation tactics."*

SGL Carbon's litigation tactic via its chapter 11 filing was to serve as a counterweight to what was viewed by it as "excessive" demands. At the same time, the financial health of the company was being announced to securities analysts. 200 F.3d at 157–58. In fact, SGL Carbon's promptly filed plan offered the class of antitrust plaintiffs neither the $240 million cash reserve of the parent nor the full cash payments provided for all other creditors. Rather, "limited time credits to purchase SGL Carbon's products" were offered the litigants. 200 F.3d at 167. While the amount of damages was clearly in dispute when SGL Carbon filed in December 1998, liability for antitrust violations apparently was not seriously at issue.[16] SGL Carbon's purpose in filing is thus readily characterized as a financially healthy enterprise's effort to gain leverage in an ongoing bargaining process. Contrast the no-cash treatment of antitrust plaintiffs in SGL Carbon's plan (filed with or close on the heels of its petition), with the $240 million reserve.

Debtors *sub judice* are not bargaining, as was SGL Carbon, nor are they freezing litigation while available cash funds are held back from litigating creditors. Rather, Debtors are attempting to *accelerate* litigation of a threshold issue vital to all Synkoloid Asbestos Actions. Liability is obviously very much at issue between Debtors and the Synkoloid Asbestos Plaintiffs. That "litigation tactic," as a creative approach to the mass tort claim allowance

**14.** Debtors' potential asbestos tort liability would seem to be inestimable at this time. By contrast:

[A]t the time SGL Carbon filed its petition, that is, before SGL AG paid its $135 million criminal fine, the $240 million reserve was untouched. In documents accompanying its petition, SGL Carbon estimated the liquidation value of the antitrust claims at $54 million. In contrast, no evidence was presented with respect to the amount sought by the antitrust plaintiffs beyond SGL Carbon's repeated characterization of their being "unreasonable."

200 F.3d at 163.

**15.** Between June 2002 and May 2003 Muralo expended over $1.3 million in legal fees (Lee 22 and 28), "a staggering sum for [a] modest [sized] company." *Id.* at 28. Whether measured against gross combined annual sales of $34 million or 2002 Muralo profits of $370,000 (Lee 2 and 3), such expenditures are simply unsustainable. Moreover, even a single high dollar value asbestos-based judgment against the Debtors could significantly affect their limited net worth.

**16.** By May following SGL Carbon's December 1998 filing, its parent and the parent's chairman had pled guilty to criminal antitrust; the die seems to have been cast as to liability, given the June 1998 establishing of the reserve, the December 1998 filing, and the May 1999 plea.

process, is not unprecedented. *Compare In re Dow Corning Corp.*, 215 B.R. 346 (Bankr.E.D.Mich.1997). Debtors' effort at declaratory relief is not an alternative to remitting available settlement funds. Debtors have no such funds, nor much hope for survival if successor liability is not contested or its effects otherwise abated. More specifically, Debtors' broader strategy since the June 2002 ARTRA filing has included:

(i) Efforts within the ARTRA bankruptcy case to be included, by extension pursuant to 11 U.S.C. 105(a), in that case's stay of asbestos-personal injury litigation, and, if possible, to be a participant in the actual plan of reorganization advanced by ARTRA[17]; and

(ii) The earlier-referenced state court coverage litigation against insurers, and a partial settlement which helps fund Debtors' attempt to obtain a judicial declaration regarding successor liability through the Adversary Proceeding.

■ It should be clear to all experienced practitioners that, absent a workable program in the ARTRA case, and/or clarity on the insurance coverage issues, and/or some success in the Adversary Proceeding, *a plan of reorganization will have to be developed in this case.* The fact that Debtors have highlighted as the cornerstone of their current bankruptcy case the declaratory judgment Adversary Proceeding—in a sense relegating a plan of reorganization to a secondary or standby role (behind a hoped-for benefit in the ARTRA case and/or in the Adversary Proceeding)—is not indicative of "bad faith." Of course, the entire program is in response to thousands of state-court cases and thus could be cast as a "litigation tactic." But the would-be rubric of "litigation tactic" is simply unavailing. In some sense, essentially all bankruptcy filings are "litigation tactics" as countermeasures to debt collection efforts. However, *sub judice,* it is beyond question that Debtors were in a desperate situation because of the chaotic litigation avalanche, and in need of bankruptcy's repose. With such a repose, Debtors have alternatives to a traditional reorganization (*i.e.,* tacking to ARTRA's plan or hoping for a grand victory on successor liability). Efforts to capitalize on those alternatives, as "litigation tactics," should not disqualify Muralo and Norton as chapter 11 debtors. Access to chapter 11 does not require petitioners to waive claim defenses, such as the current challenge to Debtors' purported successor liability, or forego other reasonable postpetition options.

This court finds that Debtors' strategy in filing is readily distinguishable from what was described as abusive litigation tactics in *SGL Carbon.*

*Timing and the need for the automatic stay.*

Nor can it be argued that Debtors did not seek out alternatives to filing chapter 11 petitions (if that is at all relevant to a threshold "good faith" inquiry). Debtors struggled for nearly a year following ARTRA's departure as their active indemnitor. Debtors undertook asbestos case defenses, became active in ARTRA's case, and began litigation with their own insurers. That year's efforts led to extraordinary counsel fees and expenses and disruption of management. Bankruptcy was a logical option under these circumstances. The benefits of the 362(a) automatic stay

---

17. Counsel for Debtors has indicated at oral argument that cash offer has been made by Debtors so as to include them in ARTRA's plan, and that such a draft plan has been developed.

were available and appropriately sought. Indeed, asbestos mass tort bankruptcy cases are today unremarkable.[18]

By way of contrast to Johns–Manville's circumstances, the Third Circuit emphasized that "[t]he litigation effected by SGL Carbon's Chapter 11 petition ... is in its nascent stages." 200 F.3d at 169. After reciting facts of SGL Carbon's financial and operational well-being, the court questioned the District Court's conclusion that litigation "might result in a judgment causing 'financial and operational ruin,'" and then concluded "that on the facts here, that assessment was premature." *Id.* at 163. The Third Circuit admonished that the debtor "has offered no evidence it could not effectively use [the automatic stay and exclusive right to formulate a reorganization plan "adjusting" any judgment amount] as the prospect of such a judgment became imminent." *Id.* This point was bolstered by reference to *In re Texaco, Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y. 1988), said to be "instructive" where "Texaco resorted to bankruptcy only after suffering an $11 billion judgment." *Id.* at 163 n. 13.

By way of counterpoint, the Third Circuit noted that the Bankruptcy Code "encourages early filing," and that its drafters "understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation" (*citing* Resnick). *Id.* at 163.

In simplest terms, Debtors are neither Texaco nor SGL Carbon. To the extent that *Texaco* and *SGL Carbon* present atypical circumstances where enormous, financially healthy enterprises are contending with nonparalyzing litigation, *SGL Carbon* does not provide a precedential barrier to chapter 11 for most filers. *Sub judice*, unmanageable asbestos mass tort litigation faced by small businesses provides a prototypical setting for implementing the Bankruptcy Code's vitally important early access policy.

This court finds that Debtors' filings were not premature, given the litigation morass ensnaring Debtors, their exposure to judgments (even judgments by default), and the extraordinary turmoil and expense of administering a nationwide asbestos mass tort litigation defense.[19] Unlike *SGL Carbon*, Debtors' timely use of the automatic stay would seem to be thoroughly consistent with the purposes of 362(a).

## II. *Significance of Adversary Proceeding*

The Asbestos Committee complains that Debtors' "bad faith" is a function of use of the immediate chapter 11 cases as a mere platform for the Adversary Proceeding.[20] The argument can be further divided into three elements. One is that no reorganization is intended by Debtors.[21] The second theme is that the Partial Settlement and Tolling Agreement between Debtors and some of their insurers (which provides

---

18. *See generally,* Resnick at 2045–46 (*citing* asbestos manufacturers who have filed for bankruptcy protection—Johns-Manville, Celotex Corp., Eagle–Picher Industries, Inc., Keene Corp., "and at least a dozen other asbestos manufacturers"). Of course, lists of filers affected would have to include, besides manufacturers, whole segments of the economy running from manufacturers, to distributers, to end-users.

19. *See, e.g.,* Lee 22.

20. "The Debtors are attempting to use the federal bankruptcy process as a litigation tactic to create a 'jurisdictional hook' to permit them to pursue a declaratory judgment in Bankruptcy Court...." Asbestos Committee Memorandum of Law 2.

21. *See* Asbestos Committee Memorandum of Law 18 and 22.

funding for the Adversary Proceeding), somehow implies "bad faith."[22] The third point attacks the Adversary Proceeding itself.[23]

*Debtors' intent to reorganize.*

■ This court disagrees with the Asbestos Committee's basic assumption that reorganization is not intended by Debtors. Certainly Debtors' preferred position is to "win"—*i.e.*, defeat all successor liability. How such a victory scenario plays out in chapter 11 must abide the event, but it conceivably could result in a proposed voluntary dismissal or a plan that is "relatively straightforward and expeditious."[24] On the other hand, if the asbestos claimants or a substantial number of them are right in their assertion of Debtors' successor liability, a plan of reorganization will be essential.[25] It is no small irony that it is the potential validity of the asbestos claims—something the Asbestos Committee would advocate—which is a factor supporting Debtors' eligibility for chapter 11. As pointed out earlier, Debtors prompt challenge to asbestos claims, which could obviate the bankruptcy, does not disqualify these Debtors.[26]

*The Partial Settlement and Tolling Agreement ("PSTA").*

The Asbestos Committee takes umbrage at the PSTA (Docket entry no. 108–2 Ex. A in the main case). Debtors' assumption of the agreement was, however, authorized by this court's order of August 5, 2003 after full hearing.

In fact, the PSTA partially interdicts and tolls limitations in the state court coverage action brought by Debtors against all of its insurers. Participating insurers, in turn, have agreed to fund (within specified limits) Debtors' in-bankruptcy efforts to resolve successor liability issues. All parties to the PSTA reserve their future rights in the coverage dispute.[27]

---

**22.** *See* Asbestos Committee Memorandum of Law 20.

**23.** *See* Asbestos Committee Memorandum of Law 23, 24, 29–35.

**24.** Debtors describe in their August 22, 2003 motion to extend the exclusive period to file a plan, etc., the following "victory" and "failure" scenarios:

Further, the Court's ultimate ruling as to the Debtors' liability *vel non* to the claimants in the Synkoloid Asbestos Actions will have a tremendous impact on the Debtors' reorganization efforts. Should the Court find that the Debtors are not liable in the Synkoloid Asbestos Actions, *then the defendants named in the Adversary Proceeding will not be entitled to any distribution from the Debtors' estates, and the preparation of a plan (or plans) of reorganization following such a determination should be relatively straightforward and expeditious.* However, should the Court find that the Debtors are liable in the Synkoloid Asbestos Actions, *then they will require substantial time to formulate a successful reorganization plan (or plans),* including continued contested proceedings to enforce the Debtors' indemnity and other claims in the chapter 11 case of *In re Artra Group, Inc.,* pending in the United States Bankruptcy Court for the Northern District of Illinois.

*See* Ex. E(18) (emphasis added) to Certification of Scott Cargill, submitted by the Asbestos Committee in support of the subject motion. Debtors' contemplation of a plan of reorganization is further evidenced in their partial settlement of coverage litigation with certain insurers; *see* note 28, *infra.*

**25.** *See* note 24 above. Note also that it is possible that a fully litigated conclusion of liability, through the Adversary Proceeding or otherwise, will not be reached. Hence, victory and failure scenarios do not exhaust all potential end results.

**26.** Chapter 11 petitions are not limited solely to circumstances where *reorganization* is being sought. *See e.g.,* 1123(b)(4) contemplating liquidating plans. "Reorganization" is not, in fact, a term found in 1112(b) (nor does it appear in 1123 or 1129).

**27.** The PSTA provides:

Surely this interim agreement cannot be read as the insurers' insistence that Debtors file chapter 11 petitions. Rather, it is recited that Debtors "have indicated *their intention* to file a voluntary petition ... *to commence a reorganization case under Chapter 11....*" PSTA at Part I p. 3 (emphasis added). Moreover, by the time this agreement was signed in late April 2003, Debtors were already in the financial and operational distress described earlier. Debtors thus exercised what this court has already determined to be reasonable business judgment in coming to interim terms with certain of its insurers.[28]

*The Propriety of the Adversary Proceeding.*

The Asbestos Committee's Memorandum of Law supporting this motion dwells on this court's purported lack of jurisdiction to hear the declaratory judgment action, as well as the alleged ineffectiveness of the relief sought. 23, 24, 29. The action's supposed violation of "the spirit" of the Anti–Injunction Act, 28 U.S.C. 2283, is also stressed 33–35.

At this time this court expresses no view of the propriety of the pending Adversary Proceeding. Presumably, motion practice in the Adversary Proceeding will raise these issues when appropriate. The Adversary Proceeding will survive the motion(s), or not; it might remain in this court or be the subject of an order withdrawing the reference. Resolution of such speculative matters is not fundamental to a determination of Debtors' good faith in seeking chapter 11 relief. Rather, the central points are clear: Debtors were in readily understandable financial and operational distress at the time of filing, and had little choice but to file and avail themselves of the 362(a) automatic stay of some 60,000 state court actions. If Debtors were ill-advised in pursuing the Adversary Proceeding, then (at least as to such a consolidating effort) the "failure" scenario might unfold and reorganization efforts would move forward on Debtors' chapter 11 agenda. Time will tell.

Though the merits of the Adversary Proceeding are not currently relevant, the

---

WHEREAS, many of the Asbestos Claims seek to hold one or more of the Insureds liable as a successor to the Synkoloid Company ("Synkoloid") and the Parties wish to resolve the issue of whether one or more of the Insureds is liable as a successor to Synkoloid as efficiently as possible and without altering, amending or waiving any of the terms, conditions, exclusions or provisions of any applicable policy of insurance and without waiving any rights against each other and against non-parties to this Agreement: ...
Docket entry no. 108–2 Ex. A p. 2.

28. The PSTA provides at Part V p. 8 ("Terms of Plan of Reorganization"):
In the event that the Insureds file a plan of reorganization, the Insureds agree that they will file, and use their best efforts to confirm, a plan of reorganization that (i) contains *requirements* for allowance of Asbestos Claims that are mutually acceptable to the Insurers and the Insureds; and (ii) provides that, to the extent Asbestos Claims

trigger coverage under any of the Insurers' policies, such coverage will only be triggered on a claim-by-claim basis if, as and when each individual Asbestos Claim is allowed.
Again, the potential for reorganization and the concomitant of a plan—particularly if efforts to avoid successor liability fail—is an evident part of Debtors' prepetition planning. Though not emphasized, consideration of the "failure" scenario is very much a factor favoring a finding that Debtors' filings were not abusive. Whether a plan filed by Debtors which is acceptable to the settling insurers will pass muster under 11 U.S.C. 1129 (including that section's good faith requirement), is obviously a very much premature inquiry at this time. However, this court's order authorizing assumption of the PSTA specifies that Part V "whatever its effect on the Debtors may be, shall not be binding upon the Court or upon any other party in interest in this case." Docket entry no. 187 main case at decretal 2.

Asbestos Committee's detour into its substantive and jurisdictional aspects bears comment. "Litigation tactics" are employed by creditors as well as by in-bankruptcy debtors. In *In re Johns–Manville*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), "strategical motivations" were identified as prompting the motion to dismiss the case, after sixteen months of bargaining over a plan of reorganization. 36 B.R. at 731. The Third Circuit distinguished SGL Carbon's circumstances (where the motion was promptly filed), from Johns–Manville's where the creditors' motion was thought to have been "spurred by an intent to extract concessions in stalled [plan] negotiations." 200 F.3d at 169.

The Asbestos Committee's motion *sub judice*, though promptly filed, is nevertheless not without its strategic motivations. Either in the guise of its motion to dismiss or as a truly believed proper component to support its motion, the committee has fired an opening salvo against the Adversary Proceeding.[29] And, subject to this court's approval, the advocacy on behalf of asbestos claimants has been proffered at Debtors' expense.[30] Suffice it to say for present purposes that "litigation tactics" and "strategical motivations" abound, particularly in mass tort-driven chapter 11 cases. The Asbestos Committee's unsurprising

negative view of the Adversary Proceeding, taken "with a grain of salt," should not disqualify Debtors from chapter 11 protections.

### III. Debtors' Petitions and "The Spectrum Ranging From The Clearly Acceptable to the Patently Abusive"

■ "The requisite fact intensive inquiry [into good faith filing] requires determining where [the debtor's] petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *In re SGL Carbon Corp.*, 200 F.3d at 163. In making this spectroscopic analysis, a court is left to find case analogs and consider established Bankruptcy Code policies (not the least of which is early access to chapter 11 previously discussed, as well as access to chapter 11 protections generally).

*SGL Carbon* and *Johns–Manville*, in tandem and as reviewed earlier, provide a basis for analysis of interdicted prepetition litigation cases such as the matter at bar. The Third Circuit indicated in *SGL Carbon* that the *Johns–Manville* filing was as a minimum acceptable if not "clearly acceptable," while SGL Carbon's filing was found to be abusive if not "patently abusive." Debtors' circumstances are, in this

---

**29.** The committee implies that Debtors' concession to successor liability would sanctify their chapter 11 filings.

> The Debtors have not filed these cases to file a plan of reorganization and then create a trust for the benefit of the asbestos claims pursuant to 524(g) of the Bankruptcy Code as has been done or is being attempted in every major asbestos bankruptcy case of which the Asbestos Committee is aware of. Rather, the Debtors seek a judicial determination in the Adversary Proceeding that they have no liability to the Asbestos Claimants.

> Asbestos Committee's Memorandum of Law, 24.

**30.** The role of the Asbestos Committee in championing the interests of asbestos claimants at Debtors' would-be expense could become even more ambiguous. The committee's announced intention to intervene in the Adversary Proceeding raises the specter of a court-appointed committee entering into the claim allowance process or a related proceeding on behalf of otherwise represented claimants. And, at the expense of Debtors. The power and duties of such committees (per 11 U.S.C. 1103(c)) will have to be admeasured against this circuit's broad support for committee intervention in adversary proceedings. *See In re Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir.1982); *Phar–Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228 (3d Cir.1994).

court's view, plainly most closely related to those of *Johns–Manville*. Again, the mass tort litigation context of *Johns–Manville* and the immediate case is found to be an overwhelming factor favoring a good faith filing determination.

The Asbestos Committee would have this court see a different result through the spectroscope. That committee's initial point of reference, besides *SGL Carbon,* is *In re Cedar Shore Resort, Inc.,* 235 F.3d 375 (8th Cir.2000). But the circumstances of *Cedar Shore* are closer to those of *SGL Carbon.* They include a financially healthy debtor, a single prepetition shareholders' suit, and the absence of any allegation that the litigation was causing operational disruption (indeed, absence of the chaos Debtors *sub judice* were experiencing).

*Cedar Shore's* "litigation tactics" are capsuled as follows:

Cedar Shore filed a petition under Chapter 11 on May 20, 1998, and its attorney decided shortly thereafter that the [shareholders'] claims were really derivative in nature, that they were actually raised on behalf of the corporation, and that they were meritless. The attorney later testified that he had spent approximately sixty hours doing his analysis. He admitted that this study had not come 'anywhere close' to the type of investigation typically undertaken in similar cases.

Cedar Shore entered into a settlement agreement with its officers, directors, and management company in which the claims were treated as derivative.... Under the agreement Cedar Shore was to release its claims against the other parties in exchange for their promise not to seek indemnification from it. Cedar Shore then moved the bankruptcy court to approve the agreement. After the bankruptcy court agreed that most of the claims were derivative and thus belonged to the estate, Cedar Shore amended the settlement agreement to provide for a $30,000 payment to each officer and director. The [shareholders] opposed the settlement agreement and moved to dismiss the bankruptcy petition as being filed in bad faith.

235 F.3d at 377. These facts bear no meaningful resemblance to the matter at bar. Debtors' effort to accelerate litigation of the threshold successor liability issue in a centralized venue—whether or not procedurally and substantively correct—has no aspect of the narrow self-dealing trickery intended by the Cedar Shore filing.

The Asbestos Committee also cites in support of its argument the bankruptcy court decision underlying the Third Circuit's most recent "good faith" filing case, *In re PPI Enterprises,* 324 F.3d 197 (3d Cir.2003) (affirming the 1998 Delaware Bankruptcy Court decision, 228 B.R. 339). The committee contends that, unlike PPI's circumstances, "Debtors [here] are not seeking to use the bankruptcy law for its intended purposes." Memorandum of Law 28.

*PPI* would, if anything, seem to undercut the committee's case. *PPI* held that it was a good faith filing where a debtor, apparently able to pay full lease rejection damages, nevertheless sought the benefits of the 11 U.S.C. 502(b)(6) "cap" on those damages. In affirming, the Third Circuit referred to the lower court's finding that the debtor was "using 502(b)(6) for exactly its intended purpose." 324 F.3d at 211 (quoting 228 B.R. at 343). In terms of the use of any particular Code section for its intended purpose, *sub judice* 362(a)'s automatic stay is being so utilized. *See In re TLCS, Inc.,* 1990 WL 52053 (Bankr. E.D.Pa.), cited in *PPI,* 228 B.R. at 345; *cf.*

*In re Walden Ridge Development, LLC,* 292 B.R. 58, 63 (Bankr.D.N.J.2003). Sixty-thousand state court cases are enjoined, allowing Debtors the repose needed to gather themselves and deal with the maelstrom. In any event, it is quite evident that *PPI* is a case which is contextually dissimilar to the matter at bar. And, one could reasonably place *PPI* further from the safe-zone of "clearly acceptable" filings than a filing on behalf of mass tort defendants such as Debtors.[31]

*SGL Carbon* cites a series of cases first articulating the good faith filing requirement, then employing it by examining "the totality of facts and circumstances to determine whether they support a finding of good faith." *See* 200 F.3d at 161 (for general references), and 162 (for quote and particular references to *In re Trident,* 52 F.3d 127, 131 (6th Cir.1995); *In re Marsch,* 36 F.3d 825, 829 (9th Cir.1994); and, *In re Laguna,* 30 F.3d 734, 738 (6th Cir.1994)). These, and other cases more fully described in 7 COLLIER 1112.07, are mileposts along the Third Circuit's theoretical spectrum for evaluating good faith filing. In this court's view, analysis of these cases fails to disqualify Debtors' filings. Rather, *Johns–Manville* and its progeny, recognizing the need for open access to bankruptcy for mass tort-driven filings, remain the most compelling precedent given Debtors' circumstances.

### CONCLUSION

This court finds and concludes:

(i) Debtors' business operations were significantly disrupted by the impact of ARTRA's June 2002 bankruptcy and the resulting requirement that 60,000 state court asbestos cases be identified, defended and managed by Debtors; the disruption of day-to-day business of the Debtors is a factor in establishing the good faith of their filings;

(ii) Debtors were not "financially healthy" when they filed; rather, they were small companies without resources to defend 60,000 asbestos cases, and without readily available insurance to provide defense costs and funds to satisfy asbestos tort judgments if they should develop; defense costs and judgments, if allowed to develop in the state court cases, had the potential to render Debtors insolvent; the potential for insolvency through enterprise-threatening mass tort litigation is thus a factor in establishing the good faith of Debtors' filings;

(iii) Debtors' strategy to challenge their liability for asbestos mass tort in the Adversary Proceeding, or to seek protection through ARTRA's plan of reorganization, reserving the right to file their own plan, is not an "abusive litigation tactic" under the circumstances of this case;

(iv) Debtors' filings were not premature, but rather are thoroughly consistent with the Bankruptcy Code's early access policy; moreover, Debtors' need for the repose provided upon filing by the 362(a) automatic stay is evident;

(v) Debtors have indicated an intention to reorganize, subject to and impacted by their strategy to challenge the

---

31. *See In re Carolin Corp.,* 886 F.2d 693 (4th Cir.1989); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11 Cir.1988); and, discussion of these cases in *PPI,* 228 B.R. at 346–47 ("To the extent that factors mentioned in *Carolin* and *Phoenix Piccadilly* apply to the case at bar, I find that because PPI filed its petition to utilize [506(b)(6)], this filing purpose overrides any of the factors in the cases that [movant] cites").

asbestos claims and/or to garner relief from ARTRA;

(vi) Debtors' Partial Settlement and Tolling Agreement with certain of their insurers does not disqualify Debtors from filing chapter 11 petitions; the business judgment exercised by Debtors in reaching the agreement was reviewed by this court previously, and the assumption of the agreement was authorized;

(vii) The propriety of the Adversary Proceeding has been raised prematurely by the Asbestos Committee, has not been ruled on by this court, and is not a factor in this court's determination of Debtors' eligibility for chapter 11; and

(viii) Considering all of the circumstances of Debtors' petition filings, and the findings and conclusions set forth above, this court has reached the conclusion that Debtors' filings fall well within the acceptable range of the spectrum referred to in *SGL Carbon,* and indeed, were "clearly acceptable."

For all of these reasons, the Asbestos Committee's motion to dismiss Debtors' jointly administered case is DENIED.[32] An implementing order is being issued with this opinion.

---

32. For the same reasons expressed herein, this court will not abstain per 11 U.S.C. 305(a); rather, Debtors deserve access to chapter 11, their filings being consistent with the ready availability of bankruptcy protections for such distressed enterprises.